# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| Portland Hunt-Alpine Club, LLC, on behalf of itself and all others similarly situated,<br><br>  *Plaintiff,*<br><br>v.<br><br>Mowi ASA (fka Marine Harvest ASA), Marine Harvest USA, LLC, Marine Harvest Canada, Inc., Ducktrap River of Maine LLC, Grieg Seafood ASA, Grieg Seafood BC Ltd., Ocean Quality AS, Ocean Quality North America Inc., Ocean Quality USA Inc., Ocean Quality Premium Brands, Inc., SalMar ASA, Leroy Seafood Group ASA, Leroy Seafood USA Inc., and Scottish Sea Farms Ltd.<br><br>  *Defendants*. | CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

Page

NATURE OF ACTION .................................................................................... 1

JURISDICTION AND VENUE ....................................................................... 3

PLAINTIFF ..................................................................................................... 5

DEFENDANTS ............................................................................................... 6

AGENTS AND CO-CONSPIRATORS .......................................................... 24

FACTUAL ALLEGATIONS .......................................................................... 25

A.    The European Commission Is Investigating Unexplained Price Increases
       In The Salmon Market ........................................................................ 25

B.    Defendants Have Illegally Engaged In Historically Unprecedented And
       Unjustified   Pricing Behavior That Has Resulted In Record Profitability.......... 30

C.    In Recent Years, Defendants Have Switches From Competition To
       Cooperation................................................................................. 39

D.    The Structure And Characteristic Of The Market For Atlantic Farm-
       Raised Salmon Support the Existence Of A Conspiracy. ..................... 51

       1.    Industry Concentration Facilitates Collusion............................. 53

       2.    Barriers to New Entry Are High. .............................................. 55

       3.    Farm-Raised Salmon Is A Commodity Product And Prices Are
              Correlated Across the Globe. .................................................... 60

       4.    Norwegian Companies Dominate The Production Of Farm-Raised
              Salmon And The Defendants Are The Largest Global Producers. ........... 63

       5.    Norwegian Companies Dominate The Production Of Farm-Raised
              Salmon And The Defendants Are The Largest Global Producers.
              Farmed Salmon Production Is Highly Inelastic And The Product is
              Perishable. ............................................................................. 64

CLASS ACTION ALLEGATIONS ................................................................. 67

INTERSTATE TRADE AND COMMERCE .................................................. 71

PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY ....... 71

i

CAUSES OF ACTION ...................................................................................................... 72

PRAYER FOR RELIEF ................................................................................................. 104

JURY DEMAND ........................................................................................................... 105

Plaintiff Portland Hunt-Alpine Club, LLC ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to various federal and state antitrust laws and state unfair competition laws and unjust enrichment laws, demands a trial by jury, and alleges as follows:

## NATURE OF ACTION

1.      This lawsuit arises from unlawful coordination of the price of farm-raised Atlantic salmon (*Salmo salar*) and salmon products derived therefrom which were sold by Defendants Mowi ASA (f/k/a Marine Harvest ASA); Mowi USA, LLC (f/k/a Marine Harvest USA, LLC); Marine Harvest Canada, Inc.; Mowi Ducktrap, LLC (f/k/a Ducktrap River of Maine LLC); Grieg Seafood ASA; Grieg Seafood BC Ltd.; Ocean Quality AS; Ocean Quality North America Inc.; Ocean Quality USA Inc.; Ocean Quality Premium Brands, Inc.; SalMar ASA; Lerøy Seafood Group ASA; Lerøy Seafood USA Inc.; Scottish Sea Farms Ltd.; and entities owned or controlled by them (collectively, "Defendants") between July 1, 2015 and the present in violation of federal antitrust law and various state antitrust and unfair competition, consumer protection and unfair trade practices, and unjust enrichment laws.

2.      As used herein, unless otherwise indicated, the term "salmon" refers to "Atlantic salmon." As further explained below, "Atlantic salmon" can be farmed not only in locations that border the Atlantic Ocean (e.g., Norway and Scotland), but also in certain locations that border the Pacific Ocean (primarily in Canada and Chile).

3. The European Commission ("EC") recently confirmed "that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon."[1]

4. The EC commenced its investigation by sending a letter in early February 2019 to the world's dominant suppliers of farm-raised salmon and their affiliates, in which it explained that it had received information that the companies—Defendants—are "participat[ing in] or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon".[2]

5. The Defendants are and have been engaging in the following conduct:

- Coordinating sales prices and exchanging commercially sensitive information;

- Agreeing to purchase production from other competitors when these other competitors sell at lower prices; and

- Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

6. Plaintiff seeks to represent a Nationwide Class consisting of all commercial and institutional purchasers in the United States and its territories that purchased farm-raised Atlantic salmon and/or products derived therefrom ("Farm-Raised Salmon"), once or more, other than

---

[1] *See* European Commission Press Release Statement/19/1310, *Antitrust: Commission Confirms Unannounced Inspections in the Farmed Atlantic Salmon Sector* (Feb. 19, 2019), http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm [hereinafter *E.C. Statement/19/1310*].

[2] *See* Tom Seaman, Norway's antitrust regulator eyes salmon price-fixing probe 'with interest', UNDERCURRENT NEWS, https://www.undercurrentnews.com/2019/02/21/norways-antitrust-regulator-eyes-salmon-price-fixing-probe-with-interest/.

directly from Defendants, entities owned or controlled by Defendants, or other producers of farm-raised salmon or products derived therefrom, from July 1, 2015 to the present (the "Class Period"). Excluded from the Nationwide Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

7.     Plaintiff seeks to represent a Damages Class consisting of all commercial and institutional purchasers in the Indirect Purchaser States[3] that purchased farm-raised salmon and/or products derived therefrom once or more other than directly from Defendants, entities owned or controlled by Defendants, or other producers of farm-raised salmon or products derived therefrom from July 1, 2015 to the present (the "Class Period"). Excluded from the Damage Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

## JURISDICTION AND VENUE

8.     Plaintiff seeks damages, restitution, treble damages, disgorgement, other monetary relief, injunctive, and other equitable relief under federal antitrust law and various state antitrust and unfair competition, consumer protection and unfair trade practices, and unjust enrichment laws, as alleged specifically herein, as well as costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of Defendants' violations of those laws.

9.     This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds $5,000,000, there are more than 100 members in each of the Classes, and there are members of each of the Classes who

---

[3] The Indirect Purchaser States, for purposes of this complaint, are the states and territories under the laws of which there are claims listed in the Causes of Action section below.

are citizens of different states than Defendants. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiff is bringing an injunctive claim under federal law.

10.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Farm-Raised Salmon throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

11.     This Court has personal jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which states that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

12.     The Court further has personal jurisdiction over the Defendants based on, *inter alia*, their residency or transaction of business in the State of Maine, their purposeful actions in placing price-fixed salmon and products derived therefrom into the stream of commerce seeking to serve Maine (into which substantial amounts of Norwegian, Scottish and Chilean salmon have been shipped during the Class period), Defendants' purposeful availment of the benefits and protections of the laws of the State of Maine, Defendants' commission of tortious acts within the State of Maine, Defendants' United States subsidiaries' purposeful activities within the State of Maine that

are imputable to parent-entity Defendants located outside the United States, and/or the "conspiracy theory of jurisdiction" recognized by a Maine Superior Court in *Sebago, Inc. v Pena*, No. CV99226, 1999 WL 35298380, at *3–4 (Me. Super. July 08, 1999) (adopting the conspiracy theory of personal jurisdiction as set forth by the Delaware Supreme Court in *Institute Bancario Italiano v. Hunter Engineering Co.*, 449 A.2d 210, 225 (Del. 1982)). This Court also has jurisdiction over Defendants based on their minimum contacts with the United States as a whole, and not simply through their contacts with the State of Maine.

13.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

14.     Venue is appropriate in this District because one or more Defendants resided or transacted business in this District and is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

<u>**PLAINTIFF**</u>

15.     Plaintiff Portland Hunt-Alpine Club, LLC is a business located at 75 Market Street Portland ME 04101. During the Class Period, Plaintiff purchased Farm-Raised Salmon, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of Farm-Raised Salmon. The Farm-Raised Salmon purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

## DEFENDANTS

16.     **Mowi Defendants.** Defendant Mowi ASA (f/k/a Marine Harvest ASA) ("Mowi ASA") touts itself as a "global corporate brand"[4] of one of the largest seafood companies in the world and the largest producer of Atlantic salmon. Mowi ASA is headquartered at Sandviksboder, 77AB, 5035, Bergen, Norway. Mowi ASA is listed on the Oslo Stock Exchange, where it is a constituent of the benchmark OBX Index.

17.     Mowi ASA is a global organization that operates through numerous subsidiaries and divisions in 25 countries, including the United States. Through its subsidiaries and divisions, Mowi ASA engages in, *inter alia*, the production, processing, and sale of farmed salmon, the operations of which are focused in Norway; Scotland; Canada; the Faroe Islands; Ireland; and Chile. Mowi ASA has a share of between 25% and 30% of the global salmon and trout market, making it the world's largest company in the sector. Mowi ASA also owns a "value added processing" unit, which prepares and distributes a range of seafood products, and a number of smaller divisions. In 2013, Mowi ASA acquired Laschinger Seafood, which owned Morpol S.A. ("Morpol"), the world leader in smoked salmon.

18.     Using its operations in the United States and other countries, Mowi ASA sells its products to the United States, as well as more than 70 different countries.[5] Mowi ASA's website states that "[m]ore than 6 million Mowi meals are enjoyed around the world every day."[6]

---

[4] *Integrated Annual Report 2018*, Mowi, 8 (2018), http://hugin.info/209/R/2239765/882920.pdf [hereinafter *Mowi Annual Report 2018*].

[5] *Id.* at 9.

[6] *Our Products*, Mowi, https://mowi.com/products/ (last visited Sept. 27, 2019).

19.     Mowi ASA is and advertises itself as a single unified global company. A recent example of this is its business strategy, unveiled in late 2018, of renaming itself from "Marine Harvest" to "Mowi," which functions as a global brand for its products. Indeed, after Mowi ASA announced its name change, its wholly owned and controlled subsidiaries also changed their names. For example, Marine Harvest USA, LLC renamed itself as Mowi USA, LLC ("Mowi USA")[7] and Ducktrap River of Maine, LLC renamed itself as Mowi Ducktrap, LLC ("Mowi Ducktrap").[8]

20.     In furtherance of its unified global business strategy, Mowi ASA promotes itself on its website and in its marketing materials as one "global fully integrated company"—"Mowi."[9] Instead of having separate websites for each wholly owned and controlled subsidiary, Mowi ASA integrates most of these subsidiaries within its main webpage under the "Contact us" tab.[10] On that webpage, it represents all of these subsidiaries, including Mowi USA; Mowi Canada West, LLC; and Mowi Canada East, LLC, as one entity—stating, as noted above, that "Mowi is located in 25 countries worldwide."[11] Mowi ASA's American subsidiaries are intertwined with the parent entity,

---

[7] Joy Weaver, *Articles of Amendment to Articles of Organization of Marine Harvest USA, LLC*, SUNBIZ (Apr. 19, 2019), http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2019%5C0423%5C27911942.Tif&documentNumber=L01000011779; *see also* MOWI ANNUAL REPORT 2018, supra note 4, at 135; *Marine Harvest Changes Name to Mowi*, SALMON BUSINESS (Nov. 13, 2018), https://salmonbusiness.com/marine-harvest-changes-name-to-mowi/.

[8] *Mowi Ducktrap Information Summary*, DEPT. OF THE SECRETARY OF STATE OF MAINE.

[9] *New Name – New Website*, MOWI BLOG, https://mowi.com/blog/2019/04/10/new-name-new-website/ (last visited Sept. 27, 2019).

[10] *Contact Us*, MOWI, https://mowi.com/contact/ (last visited Sept. 27, 2019) [hereinafter *Mowi Contact Us*].

as evidenced by Mowi USA's webpage that only identifies and provides contact information for three employees—one of whom is identified as the Sales Manager for Mowi Ducktrap.[12] In advertising employment vacancies and new job opportunities within its company, Mowi ASA provides the public only one webpage, which is not divided by company (or subsidiary name).[13] Instead, Mowi ASA consciously gives the impression that all job opportunities are within the one same "Mowi" company. The "Vacancies" webpage only identifies: (1) a brief job vacancy description; (2) the workplace (described as a destination, e.g., Fort William, Bruges); and (3) the application due date.[14]

21.     Mowi ASA's promotional materials note that Mowi employs 667 full time "[s]ales & [m]arketing" employees in "the Americas" alone,[15] and that "[t]he [sales and marketing] division is organized geographically to support our worldwide client base."[16] Mowi ASA further explains that it has "significant new product development competence in [Mowi's] central markets like the Americas."[17] In fact, in 2018 Mowi ASA experienced a 7.6% increase in the "market distribution and demand" in the United States.[18] Specifically, in 2018, the United States had

---

[11] *See id.*; Mowi USA, Mowi, https://mowi.com/contact/office/ (last visited Sept. 27, 2019); Mowi Canada East, MOWI, https://mowi.com/contact/canada-east/ (last visited Sept. 27, 2019); Mowi Canada West, MOWI, https://mowi.com/contact/mowi-canada-west/ (last visited Sept. 27, 2019).

[12] *See* Mowi, Mowi USA, *supra* note 11.

[13] *Vacancies*, Mowi, https://mowi.com/people/vacancies/ (last visited Sept. 27, 2019).

[14] *Id.*

[15] Mowi 2018 Annual Report, *supra* note 4, at 3.

[16] *Id.* at 11.

[17] *Id.*

427,900 GWT (gross weight tonnage) of Mowi ASA's market distribution and demand, nearly one-fifth of Mowi ASA's GWT for all of its markets.[19]

22.     Mowi ASA targets and transacts business in the United States, including Maine, through its wholly owned and wholly controlled subsidiary, Mowi Ducktrap, headquartered in Belfast, Maine. Mowi ASA ships salmon regularly to Mowi USA for the express purpose of transacting business within the United States. Mowi ASA is so intertwined with its United States subsidiary that Mowi USA does not even have its own website independent of Mowi ASA. Instead, as noted above, Mowi USA is relegated to one short webpage within Mowi ASA's larger website. Like the other subsidiaries identified on Mowi ASA's website, Mowi USA is marketed and advertised on that website using Mowi ASA's logo. Mowi USA's registered trademarks "REBEL FISH" and "THE SALMON KITCHEN.COM" are marketed on Mowi ASA's website as well. The public perception is such that media outlets continually describe Mowi in the United States and abroad as one interchangeable entity, referring, for example, to Mowi USA's processing plants in the United States as belonging to "Mowi."[20] Mowi USA has also been described as the "US downstream division" of Mowi ASA.[21]

_____

[18] *Id.* at 31.

[19] *Id.*

[20] Tom Seaman, *Mowi sees big US, China value-added Salmon potential with new plants*, UNDERCURRENT NEWS (Apr. 4, 2019, 5:21 PM), https://www.undercurrentnews.com/2019/04/04/mowi-sees-big-us-china-value-added-salmon-potential-with-new-plants.

[21] Tom Seaman, *Marine Harvest to more-than double Miami production with new plant*, UNDERCURRENT NEWS (Jan. 26, 2018, 5:12 PM), https://www.undercurrentnews.com/2018/01/26/marine-harvest-to-more-than-double-miami-production-with-new-plant/.

23.     Describing its expansion into the United States' seafood market, Mowi ASA explained that "[t]hrough our logistical network and well-situated facilities, we are able to reach the west coast, east coast[,] and central states within days, enabling us to provide fresh, healthy and delicious salmon and fish products to the entire US market."[22] Fulfilling the crucial role of targeting American consumers, Mowi ASA uses not only its factories in Florida, Maine, and Canada, but also its factory in Dallas, Texas, which opened in December of 2016 and replaced the role of its old factory in Los Angeles, California.[23]

24.     As described in its annual report, Mowi ASA also launched a skin pack program of farmed Norwegian Atlantic Salmon in the United States with "a new nationwide retail partner . . . giving [Mowi] a new revenue stream."[24] According to at least one media site, the nationwide partner being referred to is none other than Walmart, where Mowi ASA and Walmart's partnership with the skin pack program dates back to mid-2015.[25]

25.     Further targeting American consumers nationwide, Mowi ASA sells its farm-raised Atlantic salmon through Amazon's website, something it has done from at least late 2017 through the present.[26]

---

[22] MOWI ANNUAL REPORT 2018, *supra* note 4, at 77.

[23] Tom Seaman, Marine Harvest adds regional flavor to Wal-Mart pre-pack offering, UNDERCURRENT NEWS, (Mar. 20, 2017, 2:20 PM), https://www.undercurrentnews.com/2017/03/20/marine-harvest-adds-regional-flavor-to-walmart-pre-pack-offering/.

[24] MOWI ANNUAL REPORT 2018, *supra* note 4, at 77.

[25] Tom Seaman, Marine Harvest skin-pack salmon, whitefish sales rocket in Wal-Mart, UNDERCURRENT NEWS, (Apr. 6, 2017, 5:18 PM), https://www.undercurrentnews.com/2017/04/06/marine-harvest-skin-pack-salmon-whitefish-sales-rocket-in-walmart/.

26.     Mowi ASA has availed itself of the laws and privileges of the United States, filing forms with the United States Securities & Exchange Commission ("SEC") and benefitting from its sale to United States investors of depositary shares evidenced by American depositary receipts through Citibank, N.A. in the United States.[27]

27.     Defendant Mowi USA is a Florida limited liability company that maintains its principal place of business at 8550 N.W. 17th Street #105, Miami, Florida 33126. Mowi ASA wholly owns and controls its subsidiary Mowi USA for the purpose of causing Mowi USA to process salmon in the United States and distribute it to wholesalers, retailers, and others in the United States.

28.     Defendant Mowi Ducktrap is a Maine limited liability company and a wholly-owned and controlled subsidiary of Mowi ASA. The company has its headquarters at 57 Little River Dr., Belfast, Maine 04915. Mowi Ducktrap sells processed salmon products, such as sliced smoked salmon, under a number of trade names, including Ducktrap and Kendall Brook. These products are sold throughout the United States, including Maine.

29.     Defendant Mowi Canada West ("Mowi Canada") (f/k/a Marine Harvest Canada) is a foreign corporation and wholly owned and controlled subsidiary of Mowi ASA. Mowi Canada is headquartered at 1334 Island Highway, Suite 124, Campbell River, British Columbia, V9W 8C9, Canada. Mowi Canada processes salmon in British Columbia, Canada. Mowi ASA uses its

---

[26] Marine Harvest Fresh Atlantic Salmon, Skin-On, Responsibly Farm Raised, 12 oz by Marine Harvest, AMAZON, https://www.amazon.com/Marine-Harvest-Atlantic-Responsibly-Farm-Raised/dp/B0732ZP2HC/ref=cm_cr_arp_d_pb_opt?ie=UTF8 (last visited Sept. 27, 2019).

[27] *See* Mowi ASA, Post-Effective Amendment No. 2 to Form F-6 Registration Statement (Form F-6/A) (Dec. 14, 2018).

ownership and control over Mowi Canada to sell Atlantic salmon in Canada and the United States, including Maine. As discussed above, Mowi ASA also targets the United States through its wholly-owned and controlled subsidiary Mowi USA, and, to achieve that purpose, Mowi ASA uses its control over Mowi Canada to ship fresh salmon to Mowi USA in Florida and Mowi Ducktrap in Maine on a regular basis.

30.     As evidenced in Mowi ASA's 2018 annual report, Mowi ASA's consolidated financial statements include its subsidiaries in the United States and Canada, such as Mowi USA, Mowi Canada, and Mowi Ducktrap.

31.     Through its financial, investor, and promotional materials, Mowi ASA clearly conveys that it consists of a single global, integrated entity, and Mowi USA, Mowi Canada, and Mowi Ducktrap are each agents and/or divisions of Mowi ASA. Mowi ASA is vicariously liable for the conduct of Mowi USA, Mowi Canada, and Mowi Ducktrap in relation to the antitrust acts committed by each complained of herein. In addition, the presence of Mowi ASA, Mowi USA, Mowi Canada, and/or Mowi Ducktrap in the United States subjects all Mowi entities to the jurisdiction of this Court for the actions giving rise to this litigation.

32.     Mowi ASA, Mowi USA, Mowi Canada, and Mowi Ducktrap are collectively referred to herein as "Mowi."

33.     **Grieg Defendants.** Defendant Grieg Seafood ASA ("Grieg ASA") is a foreign corporation that describes itself as "one of the world's leading fish farming companies, specializing in Atlantic salmon."[28] Grieg ASA owns farming facilities in Finnmark and Rogaland in Norway, British Columbia in Canada, and Shetland in the United Kingdom. The company is

---

[28] *See* GRIEG SEAFOOD, https://www.griegseafood.no/en/ (last visited Sept. 27, 2019).

headquartered at C. Sundtsgate 17/19, 5004, Bergen, 5004, Norway. Grieg ASA is listed on the Oslo Stock Exchange.

34.      Grieg ASA targets and sells its salmon to the United States using its majority-owned sales agent, Ocean Quality AS ("OQ AS"). This company operates in the United States and Canada through three wholly owned subsidiaries, Defendants Ocean Quality N.A. Inc. ("OQ NA"), Ocean Quality USA Inc. ("OQ USA"), and Ocean Quality Premium Brands, Inc. ("OQ Premium Brands").

35.      Defendant OQ AS is a foreign corporation engaged in the salmon distribution business, with its headquarters at Grieg-Gaarden, C. Sundtsgate 17/19, N-5004, Bergen, Norway. Grieg ASA owns 60% of the outstanding shares of OQ AS.[29] Bremnes Fryseri AS ("Bremnes") owns the remaining 40% of OQ AS. Grieg ASA controls the operations of OQ AS and its various subsidiaries; indeed, in its 2018 annual report, Grieg ASA describes OQ AS (including its subsidiaries) as "Grieg Seafood's sales company" with "offices in the UK and Canada, taking care of Grieg Seafood's fish from the processing plant and all the way to the customers."[30] OQ AS has repeatedly shipped salmon from Norway to the United States as part of its activities.

36.      It was recently announced that Steven Leask, the Managing Director of OQ AS's operations in the United Kingdom, was leaving, in a move that one publication has linked with the ongoing EC antitrust investigation.[31]

---

[29] *Annual Report 2018*, GRIEG SEAFOOD, 208 [hereinafter *Grieg Seafood Annual Report 2018*] ("OQ sells the fish to Asia, Europe, the USA and Canada."). *See also id.* at 49.

[30] *Id.* at 85.

[31] Neil Ramsden, *Ocean Quality's UK MD leaves, as EC investigates group*, UNDERCURRENT NEWS (July 9, 2019, 10:19 AM), https://www.undercurrentnews.com/2019/07/09/ocean-quality-uk-md-leaves-as-ec-investigates-group/.

37.     The control and dominance that Grieg ASA exercises over OQ AS was confirmed by a report issued by a Committee of Experts of the Financial Services Authority of Norway.[32] The report states:

> Grieg owns 60% of OQ [AS] and, according to the shareholder agreement, has the right to appoint 3 out of 5 directors, while Bremnes owns 40% and has 2 out of 5 directors.
>
> In the Financial Supervisory Authority's assessment, OQ [AS] is not a joint arrangement, since the relevant activities that significantly affect OQ [AS]'s return do not have to be decided on unanimously by the owners, but can be made by the board or the management of the company. In the assessment of the Financial Supervisory Authority, Grieg, with a majority of the board, has control over OQ [AS], and the company must recognize OQ [AS] as a subsidiary. The company has taken note of the Financial Supervisory Authority's assessment, and in the first quarterly report for 2015 presented OQ [AS] as a subsidiary and restated the comparative figures in accordance with IAS 8 Accounting Policies, Changes in *Accounting Estimates and Errors*.

38.     During the Class Period, the Board of Directors of OQ AS has included Per Grieg ("P. Grieg") (Chairperson of the Board for Grieg ASA); Nina Grieg (Manager Business Development for Grieg ASA); Andreas Kvame ("Kvame") (CEO of Grieg ASA), Alte Harald Santorv ("Santorv") (Chief Financial Officer ("CFO") of Grieg ASA), and Knut Utheim ("Utheim") (Chief Operating Officer ("COO") of Grieg ASA).

39.     Defendant OQ NA is a foreign corporation and a wholly-owned subsidiary of OQ AS. OQ NA is headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ NA was set up to undertake distribution and sale of farm-raised salmon produced by Grieg ASA and its subsidiaries and Bremnes throughout the United States. As explained in a 2014 article:

---

[32]     Appendix A is a certified translation of the Norwegian text found at https://www.finanstilsynet.no/nyhetsarkiv/brev/2015/kontroll-av-finansiell-rapportering.

14

Norway-based Grieg Seafood announced the launch of Ocean Quality North America, which will assume exclusive responsibility for all sales and marketing of Grieg Seafood British Columbia's farmed seafood products in North America.

According to Dave Mergle, manager of the new sales organization, the move follows Grieg Seafood in Europe's launch of Ocean Quality for selling and marketing Grieg Seafood's fish a few years ago.

"That model has gone very well so recently the decision was made that this is how it should work everywhere so it's being implemented here in North America," Mergle told SeafoodSource. "What they found was that it's given [Grieg] a lot more proximity to the market and allowed them to get closer to the customers.["]

"Grieg Seafood farms in British Columbia predominantly serve the North American market. Since its inception, they've used a third party broker, Calkins and [B]urke, for sales and marketing and focused mostly on producing their fish. We've had a great relationship [with our broker, who has] done a nice job for us but we think it hasn't really allowed us to get close to marketplace. We want to bring transparency to the entire chain and deliver more value by being integrated. It will also allow us to start giving our customers more option[s] across our entire portfolio including fish from Scotland and Norway and accessing the power of the whole Grieg Network."[33]

40.    OQ NA has a dedicated sales office headed by General Manager Dennis Bryant ("Bryant"), whose direct telephone number bears a Dallas, Texas area code.[34]

41.    Defendant OQ USA is a Delaware corporation and wholly-owned subsidiary of OQ AS, with its principal place of business located at 1914 Skillman Street #110-309, Dallas, Texas,

---

[33] April Forristall, *Grieg takes over North America sales, marketing*, SEAFOODSOURCE (July 9, 2014), https://www.seafoodsource.com/news/supply-trade/grieg-takes-over-north-america-sales-marketing.

[34] *Contact*, OCEAN QUALITY, https://oceanquality.com/contact/ (last visited Sept. 27, 2019) [hereinafter *Ocean Quality Contact*].

75206-8559. OQ USA distributes salmon products produced by Grieg ASA and its subsidiaries throughout the United States.[35]

42.     Defendant OQ Premium Brands is a Delaware corporation and wholly owned and controlled subsidiary of OQ NA, headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ Premium Brands' business purpose, according to a December 7, 2018 filing with the California Secretary of State, is "MARKETING AND BRANDING."[36] OQ Premium Brands distributes salmon products produced by Grieg ASA and its subsidiaries throughout the United States.

43.     Grieg ASA's own website also evidences the link among all these subsidiary entities. For example, Grieg AS's website states: "Ocean Quality is the sales organization of Grieg Seafood and Bremnes Seashore (60% owned by Grieg Seafood ASA and 40% owned by Bremnes Fryseri AS."[37] Likewise, there is a similar interconnectedness and dependence between the Ocean Quality entities as the website fails to mention the other Ocean Quality entities. Instead, on one brief "Contact" page within OQ AS's website, OQ AS lists its sales offices across the world, identifying only one employee for the USA region—Bryant—and only one employee for the North America region—Managing Director Alexander Krutoy.[38]

---

[35] *See* GRIEG SEAFOOD ANNUAL REPORT 2018, *supra* note 29, at 208 ("Ocean Quality USA Inc. [is] domiciled in the USA.").

[36] State of California, *Statement of Information (Foreign Corporation)*, OFFICE OF THE SECRETARY OF STATE OF THE STATE OF CALIFORNIA (Dec. 7, 2018), https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=04201105-25258957.

[37] *Sales*, GRIEG SEAFOOD, https://www.griegseafood.no/sales/ (last visited Sept. 27, 2019).

[38] OCEAN QUALITY CONTACT, *supra* note 34.

44.     In addition to targeting and selling salmon into the United States through OQ AS and its subsidiaries, Grieg ASA targets and sells its salmon to the United States, by also using its wholly-owned and controlled subsidiary, Defendant Grieg Seafood BC Ltd. ("Grieg BC"). Grieg BC is a foreign corporation and wholly-owned and controlled subsidiary of Grieg ASA. Grieg BC is headquartered at 1180 Ironwood Street # 106, Campbell River, British Columbia, Canada, V9W 5P7. Grieg BC farms salmon on 22 sites in British Columbia.

45.     Due to its key location, Grieg ASA uses and controls Grieg BC to produce salmon targeted for the American market.[39] In its 2017 annual report, Grieg ASA explained Grieg BC's increase in earnings before interest and taxes ("EBIT"), noting that "[h]aving production close to the US market is advantageous due to fast deliveries and shorter transport."[40] A year later, in its 2018 annual report, Grieg ASA again correlated the success between the increased sales in the United States market and Grieg BC's production in Canada: "[t]he main change in our share of sales was an increase to the USA from 9 % in 2017 to 14 % in 2018 due to record high harvest volumes in Grieg Seafood British Columbia."[41]

46.     Grieg BC produces Skuna Bay, a branded salmon product that is marketed and sold throughout the United States. Evidencing the interconnected nature of the different Grieg and Ocean Quality entities, Grieg ASA's 2018 annual report explained that Skuna Bay is "Grieg

---

[39] *See Annual Report 2017*, GRIEG SEAFOOD, 48 [hereinafter *Grieg Seafood Annual Report 2017*] ("OQ sells the fish to Asia, Europe, the USA and Canada.").

[40] *Id.*

[41] *See* GRIEG SEAFOOD ANNUAL REPORT 2018, *supra* note 29, at 95.

Seafood's premium brand from British Columbia"[42] and is sold, along with its other salmon products, by OQ AS's subsidiaries.

47.     As part of its success in the American market, Grieg ASA's annual report publicized that "[t]he White House served Skuna Bay Salmon on the menu for the Inauguration Dinner to former President and First Lady of the United States, Barack and Michelle Obama."[43] Indeed, Skuna Bay Salmon had been "served at more than 2,500 high-end restaurants and boutique retailers" across the United States by 2015,[44] and Grieg ASA's 2018 annual report listed a half dozen top restaurants throughout the United States that purchased Skuna Bay salmon.[45] In addition to being served at top American restaurants, Skuna Bay salmon has gained marketing and exposure through its partnerships with the James Beard Foundation, headquartered in New York, and the Women Chefs and Restaurateurs organization.[46]

48.     The report highlighted the significance of Skuna Bay sales for Grieg ASA. Adam O'Brien, General Manager for Skuna Bay at Ocean Quality Canada, explained that "[m]ost months, Skuna Bay accounts for approximately only five % of the volume and delivers roughly 25% of our margins."[47]

---

[42] *See id.* at 85.

[43] *Id.*

[44] *Skuna Bay Salmon Expands to Florida Adding North Star Seafood to its Roster of Exclusive Purveyors*, SKUNA SALMON (Apr. 23, 2015), https://www.skunasalmon.com/news/158-skuna-baysalmon-expands-to-florida-adding-north-star-seafood-to-its-roster-of-exclusive-purveyors [hereinafter *Skuna Salmon*].

[45] *See* GRIEG SEAFOOD ANNUAL REPORT 2018, *supra* note 29, at 86.

[46] *Id.*

[47] *Id.*

49.     Although Skuna Bay salmon was first sold to the United States market in 2011, the brand was so successful that by mid-2015, Skuna Bay was being sold across the country.[48] Now "Skuna Bay salmon has achieved national U.S. distribution, available in all continental U.S. states . . . and sixteen exclusive distributor relationships across North America."[49] Skuna Bay salmon is distributed in Maine.[50]

50.     Grieg ASA is vicariously liable for the conduct of OQ NA, OQ USA, and OQ Premium Brands in relation to the antitrust acts committed by each complained of herein. In addition, the presence of OQ NA, OQ USA, and OQ Premium Brands in the United States subjects all Grieg entities to the jurisdiction of this Court for the actions giving rise to this litigation.

51.     Grieg ASA, Grieg BC, OQ AS, OQ NA, OQ USA, and OQ Premium Brands are referred to collectively herein as "Grieg."

52.     **SalMar Defendant.** Defendant SalMar ASA ("SalMar") is a foreign corporation that describes itself as "one of the world's largest and most efficient producers of Atlantic salmon, and is vertically integrated along the entire value chain from broodfish, roe and smolt to harvesting,

---

[48] *Sysco-owned distributer to bring Grieg's 'Skuna Bay' salmon to Texas*, UNDERCURRENT NEWS (May 9, 2019, 9:29 AM), https://www.undercurrentnews.com/2016/05/09/sysco-owned-distributor-to-bring-griegs-skuna-bay-salmon-to-texas/; SKUNA SALMON, *supra* note 44.

[49] FISHCHOICE, https://fishchoice.com/seafood-supplier/ocean-quality-north-america-inc (last visited Sept. 27, 2019) [hereinafter *FishChoice Supplier Directory*].

[50] *Skuna Bay Salmon Expands to New England, Adding Ipswich Shellfish Company to Its Roster of Exclusive Purveyors*, SKUNA SALMON (July 22, 2013), https://www.skunasalmon.com/news/skuna-bay-salmon-expands-to-new-england-adding-ipswich-shellfish-company-to-its-roster-of-exclusive-purveyors?site=responsive.

processing and sales."[51] The company is headquartered at Idustriveien 51, N-7266, Kverva,

Norway. SalMar is listed on the Oslo Stock Exchange.

53.    According to SalMar's website:

SalMar has established a fully integrated system for farming, processing, sales and distribution of farmed salmon and is thus in control of the total value chain.

The salmon that SalMar is producing is sold through an in-house salesforce and/or through close partners.

Proximity to markets and customers, direct or through partners is important to secure efficient use of a high-quality raw material that has been through a traceable and controlled production process.

InnovaMar is the name of SalMar's new harvesting and processing facility in Frøya, central Norway. It aims to be the world's most innovative and efficient facility for the landing, harvesting and processing of farmed salmon. InnovaMar covers 17,500 m2 of floor space and comprises two departments (harvesting and processing). The facility has the capacity for all kinds of storage. Good internal logistics ensure safe and efficient handling of the products. The increased capacity affords a high level of flexibility with regard to organising production and sales.

SalMar produces a wide variety of fresh and frozen salmon products. The customer base is global and includes small and large importers/exporters, as well as larger processing companies and retail chains.[52]

54.    SalMar sells directly to entities within the United States:

SalMar had direct sales to around 50 different countries in 2017. SalMar's most important geographic market in 2017 was Europe, with Poland, Lithuania and Sweden as the largest individual markets. The second largest market was Asia, with Vietnam, Japan and Singapore as the largest individual markets. After sales to

---

[51] *See* 2017 Annual Report, SALMAR, 45 (2017), http://hugin.info/138695/R/2188425/846513.pdf [hereinafter *SalMar Annual Report* 2017].

[52] *See Sales & Distribution*, SALMAR, https://www.salmar.no/en/sales-distribution/ (last visited Sept. 27, 2019).

Russia were blocked in 2014, North America has been the third largest market, with the USA as the largest individual market. SalMar experienced particularly strong growth in the American market in 2017.[53]

55.     North America is the third largest export destination for SalMar.[54] In 2018, its group revenue from the USA and Canada totaled 1,989,222 (measured in thousands of Norwegian krone ("NOK")).[55]

56.     SalMar targets and transacts business in the United States and has sold salmon to customers in Maine.

57.     **Lerøy Defendants.** Defendant Lerøy Seafood Group ASA ("Lerøy ASA"), a foreign corporation, is a seafood production and distribution company. Lerøy ASA is the second largest salmon and trout farming company in the world and has fish farms in Hitra, Kristiansund, Troms and Scotland (Shetland). The company is headquartered at Thormøhlens gate 51 B, 5006 Bergen, Norway.

58.     On its website, Lerøy ASA describes itself as a "global presence stretching from China to the USA" and selling to "more than 70 markets worldwide."[56] Lerøy ASA's website also promotes its global reach and sales offices in the United States:

---

[53] *See* SALMAR ANNUAL REPORT 2017, *supra* note 51, at 53.

[54] *See 2018 Environment and Social Responsibility Report*, SALMAR, 55 (2018) http://hugin.info/138695/R/2242726/885264.pdf.

[55] *2018 Annual Report*, SALMAR, 93 (2018), http://hugin.info/138695/R/2242726/885263.pdf.

[56] *About Lerøy*, LERØY SEAFOOD GROUP, https://www.leroyseafood.com/en/aurora/about-leroy/?_t_id=1B2M2Y8AsgTpgAmY7PhCfg%3d%3d&_t_q=usa&_t_tags=language%3ano%2c siteid%3a4f9c115d-7280-41c1-bc1b318c9d6edd9e%2clanguage%3aen&_t_ip=62.92.69.136&_t_hit.id=Leroy_Core_CMS_Pag es_Aurora_AuroraPage/_9a11e54b-4ab7-4bc3-bff5-1f57c5bf5304_en&_t_hit.pos=1 (last visited Sept. 27, 2019).

> Our main office is located in Bergen, but we have fishing vessels and fish farms in operation along the entire coast of Norway. We have production and packaging plants in Norway, Sweden, Denmark, Finland, France, the Netherlands, Portugal, Spain and Turkey. We also have sales offices in the USA, Japan and China.[57]

59.     A press release advertised the "Lerøy Seafood Group [as] the world's second largest farmer of Atlantic salmon . . . . [e]stablished in 1899, its global network today spans Sweden, France, Portugal, China, Japan and the USA."[58]

60.     Defendant Lerøy Seafood USA Inc. (f/k/a "Hallvard Lerøy USA, Inc.") ("Lerøy USA"), a North Carolina corporation and wholly-owned and controlled subsidiary of Lerøy ASA, is the United States distribution subsidiary for Lerøy ASA's farm-raised salmon business and sells and distributes Lerøy ASA's farmed salmon throughout the United States. Lerøy USA's principal place of business is located at 1289 Fordham Blvd., Suite 406, Chapel Hill, NC 27514.

61.     Lerøy USA operates as a division of Lerøy ASA. Indeed, Lerøy USA does not have its own official website. Instead, Lerøy USA is identified within Lerøy ASA's main website as one of Lerøy ASA's offices for "VAP [value-added processing], Sales & Distribution."[59] The only information provided on Lerøy ASA's website for Lerøy USA is the address, contact telephone number, and contact email address for one employee.[60] Lerøy USA's Bloomberg profile states that

---

[57] *See About Lerøy*, Lerøy, https://www.leroyseafood.com/en/about-us/about-leroy/ (last visited Sept. 27, 2019).

[58] Press Release, Lerøy, *Premium Aurora Salmon from Arctic Norway Now Available in Singapore*, http://www.dunbarjones.com/assets/userfiles/Aurora_Salmon_in_Singapore.pdf (last visited Sept. 27, 2019).

[59] *Contact*, Lerøy, https://www.leroyseafood.com/en/contact/our-offices/ (last visited Sept. 27, 2019).

[60] *Id.*

it has only three employees and that its business consists of "the wholesale distribution of fresh, cured, or frozen fish and seafood."[61]

62.     Lerøy ASA's premiere brand of salmon is Aurora salmon.[62] Aurora salmon is sold by Lerøy USA throughout the United States.[63]

63.     Lerøy ASA has availed itself of the laws and privileges of the United States, filing SEC forms and benefitting from its sale of depositary shares to United States investors evidenced by American Depositary receipts through Citibank, N.A. in the United States.[64]

64.     Lerøy ASA and Lerøy USA are collectively referred to herein as "Lerøy."

65.     **Scottish Sea Farms Defendant.** Defendant Scottish Sea Farms Ltd. ("Scottish Sea Farms") is an aquaculture company that engages in the farming and production of salmon. Scottish Sea Farms is the United Kingdom's second largest producer of farmed salmon.[65] The company sells its products to retailers in the United Kingdom, the United States, Europe, and internationally. Scottish Sea Farms is a joint venture of Defendants SalMar and Lerøy, and each owns a 50% interest in Scottish Sea Farms through an entity known as Norskott Havbruk AS ("Norskott Havbruk"). Norske Havbruk includes among its officers or directors Henning Beltestad (Chief

---

[61]     Bloomberg Profile for Lerøy, BLOOMBERG, https://www.bloomberg.com/profile/company/1008310D:US (last visited Sept. 27, 2019).

[62] *Key Brands*, LERØY, https://www.leroyseafood.com/en/brands/aurora-salmon/ (last visited Sept. 27, 2019); Aurora Salmon Fillets, LB, CENTRAL MARKET SHOP, https://centralmarket.com/product/aurora-salmon-fillets-lb/ (last visited Sept. 27, 2019); Aurora Norwegian Salmon, BALDUCCI'S FOOD LOVER'S MARKET, https://www.balduccis.com/details/aurora-norwegian-salmon (last visited Sept. 27, 2019).

[63] *FishChoice Supplier Directory*, *supra* note 49.

[64] *See* LERØY SEAFOOD GROUP ASA, Registration Statement (Form F-6) (July 7, 2015).

[65] *See* SALMAR ANNUAL REPORT 2017, *supra* note 51, at 45.

Executive Officer ("CEO") of Lerøy), Helge Singelstad ("Singelstad") (Chairman of Lerøy), Lief-Inge Nordhammer (a Board member of SalMar), and Gustav Witzøe ("Witzøe") (co-founder and Director of Strategic Projects for SalMar). The company is headquartered at Laurel House, Laurelhill Business Park, Stirling, FK7 9JQ, United Kingdom, 01786 44552. The United States was the leading destination for exported Scottish farmed salmon four years in a row in 2014, reaching $334.2 million in that year alone, according to the Scottish Salmon Producers Organization; Jim Gallagher, Managing Director of Scottish Sea Farms, called this "a great jump in our performance."[66] By 2017, Scottish salmon exports to the United States were £193 million, continuing its position as the largest export market.[67]

## AGENTS AND CO-CONSPIRATORS

66. The acts alleged against the respective Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of the respective Defendants' businesses or affairs. The respective Defendant parent entities identified herein exercise dominance and control over all of their respective Defendant subsidiary entities and those respective subsidiaries have a unity of purpose and interest with their respective parents. To the extent any respective parent Defendant did not keep a tight rein on its respective subsidiary Defendant(s), it had the power to assert control over the subsidiary if the latter failed to act in the parent's best interests. The respective parent Defendants and their respective subsidiary Defendants thus operated as a single economic unit. The respective subsidiaries played a critical role in the conspiracy in that they (as well as the

---

[66] *Scottish Salmon Exports to US to Reach £200m*, SEAFOODSOURCE, (Mar. 13, 2014), https://www.seafoodsource.com/news/aquaculture/scottish-salmon-exports-to-us-to-reach-200m.

[67] *Scottish salmon export value hits £600m record*, FISHFARMINGEXPERT, (Feb. 9, 2018, 7:14 PM), https://www.fishfarmingexpert.com/article/scottish-salmon-export-value-hits-600m-record/.

respective parent Defendants) sold price-fixed farmed salmon and products derived therefrom to purchasers outside Defendants' conspiracy in the United States.

67.     When Plaintiff refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, it is to be understood that the Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented at any such meetings and discussions by its agents and was a party to the agreements reached by them.

68.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

69.     Each Defendant acted as the principal, agent, or joint venturer of or for other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

**A.     The European Commission Is Investigating Unexplained Price Increases In The Salmon Market**

70.     On February 19, 2019, *Undercurrent News*, a fishing industry trade publication, reported that in early February of 2019, the EC opened an antitrust investigation into the world's major producers of farm-raised salmon:

> According to the letter, the EC has "received information -- **from different actors operating at different levels in the salmon market -- alleging that Norwegian producers of farmed Atlantic salmon . . . participate or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon.**"

The letter, which was sent to producers at the start of February, states the Norwegian producers concerned have been allegedly:

- Coordinating sales prices and exchanging commercially sensitive information;

- Agreeing to purchase production from other competitors when these other competitors sell at lower prices; and

- Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

    Based on the information the EC has, these alleged practices have been going on since "at least" November 2017 and "are presumably ongoing."[68]

71.     The EC also released the following statement on February 19, 2019:

The European Commission can confirm that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon.

**The Commission has concerns that the inspected companies may have violated EU [("European Union")] antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union).** The Commission officials were accompanied by their counterparts from the relevant national competition authorities.[69]

72.     According to another article in *Undercurrent News* dated February 19, 2019, Mowi,

Grieg, and SalMar have all confirmed that they were the subject of EC raids:

*Undercurrent* first reported the news earlier on Tuesday, then Mowi, Grieg Seafood and SalMar all confirmed raids on their operations in the UK. Mowi's spokesman said the company's plant in Rosyth,

---

[68] *See* Seaman, *Norway's antitrust regulator eyes salmon price-fixing probe 'with interest,' supra* note 2 (emphasis added).

[69] *See* E.C. STATEMENT/19/1310, *supra* note 1 (emphasis added).

UK, was raided, but then also confirmed a plant in Lemmers, formerly Marine Harvest Sterk, was inspected.

The Sterk plant, the only one the company owns in the Netherlands, is mainly specialized on coating whitefish, but also does some salmon, according to its website.[70]

73.     In a recently released annual report for 2018, Mowi admitted:

In February 2019, The European Commission carried out unannounced inspections at selected premises of several Norwegian salmon companies, including Mowi. The Commission was acting on concerns that the inspected companies may have violated EU antitrust rules.[71]

74.     On February 19, 2019, Grieg filed a notice with the Oslo Stock Exchange stating

as follows:

The European Commission DG (Director General) Competition has today performed an inspection at Grieg Seafood Shetland to explore potential anti-competitive behavior in the salmon industry.

Grieg Seafood aims to be open, transparent and forthcoming and will provide all necessary information requested by the European Commission DG Competition in its investigation.[72]

75.     On February 20, 2019, Lerøy filed a notice with the Oslo Stock Exchange stating

as follows:

EU's competition authorities (European Commission Director General Competition) has conducted an inspection at the premises of Scottish Sea Farms Ltd.  A company owned 50% by Lerøy Seafood Group ASA (LSG). The purpose is, according to the

---

[70] *See* Tom Seaman, *Mowi Dutch plant also raided as EC confirms probe of alleged salmon cartel*, UNDERCURRENT NEWS, https://www.undercurrentnews.com/2019/02/19/mowi-dutch-plant-also-raided-as-ec-confirms-probe-of-alleged-salmon-cartel/.

[71] *See* MOWI 2018 ANNUAL REPORT, *supra* note 4, at 216.

[72] *See Stock Exchange Filings*, GRIEG SEAFOOD, https://www.griegseafood.no/inverstors/stock-exchange-filings/ (last visited Sept. 27, 2019).

> competition authorities, to investigate accusations of anti-
> competitive cooperation in the salmon market. In connection with
> the inspection, the EU competition authorities has also requested for
> [sic] information from the shareholders in Scottish Sea Farms Ltd.[73]

76.     Also on February 19, 2019, SalMar issued the following report to the Oslo Stock

Exchange:

> On 19th of February 2019 the European Commission Director
> General Competition performed an inspection at Scottish Sea Farms
> Ltd., in which SalMar ASA indirectly owns 50 per cent. SalMar is
> in constructive dialogue with the Commission in this regard.[74]

77.     The inspections by the EC were not undertaken casually. Inspections are typically

done by an order of the EC, and the EC must have "reasonable grounds for suspecting an

infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out

by the Commission are intended to enable it to gather the necessary documentary evidence to

check the actual existence and scope of a given factual and legal situation concerning which it

already possesses certain information."[75] The EC relied on multiple sources to support its very

specific allegations that justified the raids.

78.     The EC's recent investigation into the farmed salmon industry is also not without

precedent. In a decision entered in 1992, the EC found the former Fiskeoppdretternes Salgslag

Organization ("FOS") (the Norwegian Fresh Fish Trade Association), the Scottish Salmon

---

[73] *See Stock Exchange Notices*, LEROY SEAFOOD, https://www.leroyseafood.com/en/investor/
Stockexchangenotices/ (last visited Sept. 27, 2019).

[74] *See* SALMAR ASA, Comment to *Inspection by the European Comm'n*, NEWSWEB (Feb. 19,
2019, 8:21 PM), https://newsweb.oslobors.no/message/470051.

[75] Case No. T-135/09, *Nexans France SAS v. Comm'n*, 2012 E.C.R. 43,
http://curia.europa.eu/juris/document/document_print.jsf?doclang=EN&text=&pageIndex=0&pa
rt=1&mode=lst&docid=129701&occ=first&dir=&cid=663482.

Growers' Association ("SSGA"), the Scottish Salmon Farmers' Marketing Board ("SSB"), and the Shetland Salmon Farmers Association ("SSA") had entered into an unlawful agreement to fix the minimum prices of farmed Atlantic salmon back in 1989 that ended in 1991 with the bankruptcy of FOS.[76] The three Scottish entities had accused the FOS of dumping salmon at low prices. Although the complaint was terminated without decision, the FOS decided to create a minimum pricing system on exported Norwegian salmon. The Scottish entities accepted this proposal and adjusted their own prices accordingly. The EC found that FOS had created a "coordinated plan to stabilize and increase salmon prices" and that the SSB, SSGA, and SSFA "contributed to this plan by assuring FOS that they urged their members to exercise price discipline in support of the Norwegian action."[77] One of the means of implementing the agreement was the SSB providing FOS with confidential price and volume statistics by SSGA and SSFA members. "The regular contacts to exchange price information provided the parties with an opportunity to monitor the success of their agreement."[78]

79.     Similarly, the Australian Competition and Consumer Commission found in 2003 that the Tasmanian Salmonid Growers Association facilitated an illegal agreement in 2002 to have Atlantic salmon farmers cull 10 percent of their salmon stocks in order to reduce the scope of any price reductions caused by oversupply.[79]

---

[76] *See* Appendix B.

[77] *Id*. at 19.

[78] *Id*.

[79] *See Federal Court Declares Tassal Limited and Tasmanian Salmonid Growers Association involved in Anti-Competitive Fish Cull*, AUSTRALIAN COMPETITION & CONSUMER COMM'N (Aug. 1, 2003), https://www.accc.gov.au/media-release/federal-court-declares-tassal-limited-and-tasmanian-salmonid-growers-association.

80.     There is a plausible basis to conclude that similar types of unlawful misconduct are occurring now and have affected worldwide farmed Atlantic salmon prices, including prices of such salmon sold in the United States.

**B.     Defendants Have Illegally Engaged In Historically Unprecedented And Unjustified Pricing Behavior That Has Resulted In Record Profitability.**

81.     The salmon market is susceptible to manipulation by the major salmon producers in Norway. As alleged further below, the industry is highly concentrated, and the spot market for salmon in Oslo, Norway is the most important benchmark for salmon prices around the globe.

82.     Salmon is sold on the spot market and through annual contracts. Only one percent of Norway's salmon production is sold on the spot market, but those spot prices set the baseline for the longer term contract prices.[80]

83.     As alluded to in the EC's letter to the companies being investigated, since 2015, salmon buyers in Europe have complained that Norway's salmon producers, including Mowi, have been rigging the spot market by using subsidiary companies, including Mowi's Polish subsidiary, Morpol (which is, as noted above, a fish processor and distributor and the world's leading producer of smoked salmon products) to drive up the spot price. As the purchasing director of Graal S.A. ("Graal") (a Polish salmon processor) Alina Piasecka, has explained, "[w]e've seen examples of prices falling in the spot market, and exporters offering fish at increasingly lower prices." She continued, "[s]uddenly, 15 minutes later there are aren't fish available, and we find out that Morpol has purchased perhaps 60 truckloads." Graal's CEO Boguslaw Kowalski alsoexplained that "[w]e

---

[80] *See* Aslak Berge, *Suempol Norway's GM doesn't believe in price caps for second half of 2017*, SALMONBUSINESS.COM, https://salmonbusiness.com/suempols-gm-does-not-believe-in-price-caps-in-the-second-half-of-2017/.

are seeing that now and again they take advantage of Morpol to buy at higher prices than that charged by the market, to hike up prices."[81]

84.     In 2017, Stale Hoyem ("Hoyem"), general manager of Suempol Norway, one of the biggest smoked salmon producers in Poland and Europe, complained that "companies in Norway buy small quantities of salmon to raise the price for the rest of the players." Hoyem added that "[o]ne last thing that affects prices is that some of the major players choose to create their own purchasing departments buying a truckload here and a truckload there;" he was "suggesting this 'daily' practice is heavily influencing prices on the spot market."[82] Borge Prytz Larsen, purchasing director at Severnaya, which imports salmon into Russia, confirmed Hoyem's statement: "The big players buy fish, and they then use the price as indicators for other customers."[83]

85.     There is no good non-collusive reason for why the "big players"—the Norwegian Defendants here—would need to make limited salmon spot market purchases except to drive up the prices on that market. Each of them is an integrated farmed salmon producer.  They simply do not need to buy more fish.

---

[81] *See Marine Harvest Accused of Manipulating Polish Salmon Market*, INTRAFISH (Aug. 8, 2016), https://www.intrafish.com/news/751597/marine-harvest-accused-of-manipulating-polish-salmon-market.

[82] *See Norwegian Salmon Giants Accused of Price Manipulation*, INTRAFISH (Aug. 22, 2017), https://www.intrafish.com/news/1330269/norwegian-salmon-giants-accused-of-price-manipulation.

[83] *Id.*

86.    Defendants' pricing behavior changed at the start of the Class Period. Hoyem also complained: "In the old days we could negotiate contracts. Producers looked at their cost and then they put on a surcharge of about NOK 1 (€0.11/$.13) to NOK 2 (€0.21/$.25) [per kilo]."[84]

87.    The foregoing are examples of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors and made for no other discernible reason than collusion.

88.    As a result of the conspiracy, Defendants' prices—and profits—for salmon have been increased since mid-2015, as Mowi itself illustrates in this chart:[85]



_____

[84]  *Id.*

[85]  *See Salmon Farming Indus. Handbook 2019*, MOWI, 41 (2019), https://corpsite.azureedge.net/corpsite/wp-content/uploads/2019/06/Salmon-Industry-Handbook-2019.pdf [hereinafter *Mowi Salmon Industry Handbook 2019*].

89.     Defendants frequently—and falsely—asserted that cost increases justified their price increases, but their own data disproves their purported justification. For example, the following chart from Mowi indicates that the "cost in box" of producing salmon (per kilogram) has increased approximately half of one Euro (or less) during the Class Period—far less than salmon prices:[86]



90.     The biggest single production cost for producers of farmed salmon is feed. As Mowi notes in its 2018 Handbook, "[h]istorically, the two most important ingredients in fish feed have been fish meal and fish oil. The use of these two marine raw materials in feed production has been reduced in favour of ingredients such as soy, sunflower, wheat, corn, beans, peas, poultry by-products (in Chile and Canada) and rapeseed oil. This substitution is mainly due to heavy constraints on the availability of fish meal and fish oil."[87] The following chart from that Handbook,

---

[86] *See* MOWI ANNUAL REPORT 2018, *supra* note 4, at 253.

[87] *See* MOWI SALMON INDUS. HANDBOOK 2019, *supra* note 85, at 62.

however, shows that these feed components either stabilized or declined in the period since mid-2015.[88]

## 08 Feed Production



8.5 Feed raw material market



91.     It is true that Mowi, for example, markets "organic" farmed salmon that are fed primarily fish meal and fish oil.[89] But the costs for those two components fell significantly during part of the Class period, as Mowi's own chart confirms. And economic data compiled by the Federal Reserve Bank of St. Louis on global fish meal prices show that prices collapsed at the beginning of 2015, thus providing no cost justification for the price increases by farmed salmon producers that commenced later that year.[90]

---

[88] *Id*. at 57.

[89]     *See     Mowi     Ireland's     Organic     Salmon     FAQ's*,     Mowi, http://marineharvestireland.com/product/about-marine-harvest-ireland-organic-salmon/     (last visited Sept. 27, 2019).



92.     In sum, as the foregoing charts reflect, the price increases for salmon in 2015 and following years, viewed in relation to production costs, represent a structural break from past practices. Indeed, in prior periods, the Norwegian farmed salmon industry has been accused of dumping their product overseas at unreasonably low prices.[91]

93.     It has sometimes been asserted that increased demand explains the price increases since mid-2015, but that explanation also does not hold water here. In August of 2014, Russia banned imports of Norwegian seafood in response to economic sanctions imposed by the United States, the EU, and others for its annexation of the Crimea; prices in Norway fell by ten percent as

---

[90]  *See Global Price of Fish Meal*, FRED ECONOMIC DATA, https://fred.stlouisfed.org/series/PFISHUSDM#0 (last visited Sept. 27, 2019).

[91] *See Fresh and Chilled Atlantic Salmon from Norway*, Inv. Nos. 701-TA-302 and 731-TA-454, USITC Pub. 3835 (Jan. 2006) (Second Review), https://www.usitc.gov/publications/701_731/pub3835.pdf; European Commission Press Release Memo/06/87, Norwegian Salmon (Feb. 21, 2006), http://europa.eu/rapid/press-release_MEMO-06-87_en.htm.

a result.[92] The ban was supposed to last a year, but Russia extended it in late June of 2015 and it remains in effect.

94.     This is highly significant because, as an analyst at Swedbank Markets explained in 2017, "Russia's import ban wiped out 10 percent of Norway's salmon market."[93] Teimuraz Ramishvili ("Ramishivili"), the Russian ambassador to Norway, said in 2018 that "[f]rom an economic point of view, **Norway lost a billion dollars from the fish trade with Russia**. There were attempts from Oslo to find new markets, great hopes were associated with China, **but the Russian market was not replaced**."[94]

95.     Ramishvili's estimate of the loss to Norwegian salmon farmers like the Defendants turned out to be severely understated. In January of 2019, the industry publication *Intrafish* reported that:

> Russia was once one of the seafood sector's most promising markets -- for Norwegian seafood suppliers in particular.
>
> **But since the 2015 ban on seafood imports from several Western countries, the Norwegian salmon industry alone has lost NOK 20 billion (€2 billion/$2.3 billion)**, according to estimates from Asbjørn Warvik Rørtveit, director of market insight and market access at the Norwegian Seafood Council (NSC).[95]

---

[92] *See* Ole Petter Skonnord, *Update 1-Russia Sanctions Throw Norway's Fish Industry into Turmoil*, REUTERS (Aug. 8, 2014, 8:25 AM), https://www.reuters.com/article/ukraine-crisis-sanctions-salmon-idUSL6N0QE32E20140808.

[93] *See Norway fails to find new buyers for its fish after losing Russian market*, RT (Mar. 15, 2018, 2:56PM), https://www.rt.com/business/416729-norway-fish-russian-market-sanctions/.

[94] *Id.* (emphasis added).

[95] *Norway's Seafood Firms Have Lost Nearly $3 Billion Since Russian Ban*, INTRAFISH (Jan. 16, 2019), https://www.intrafish.com/marketplace/1673343/norways-seafood-firms-have-lost-nearly-usd-3-billion-since-russian-ban.

96.     The Mowi pricing chart depicted in paragraph 91 shows declining Norwegian salmon average prices in 2014 attributable to the Russian import ban. But it also shows average prices ramping drastically upward in mid-2015 (shortly *after* Russia extended that ban) and continuing to increase or stabilize in succeeding years while the ban continued. These sustained, historically unprecedented price increases can only be explained by collusion. Norwegian salmon farmers knew that a huge portion of demand and their export market had been eliminated and reacted by collusively raising prices. The planning cycle for the production of Norwegian salmon in 2015 had been set three years earlier in 2012 (before the Russian ban), as Mowi's 2018 Investor's Handbook itself reflects.[96] Yet despite this supply of salmon based on an overall market that no longer existed in 2015 and despite the fact that the ban had caused salmon prices to drop in 2014, Defendants, by conspiring together, were able to raise prices substantially and keep prices at levels significantly above those experienced in 2014.

97.     These price increases since mid-2015 have resulted in huge profits for the Defendant farmed salmon producers. According to Mowi's 4Q 2018 financial disclosures:

> "2018 was a very good year for Mowi. Strong demand for salmon and high prices in all markets resulted in great earnings for the company. I am proud of all my colleagues who work hard to produce healthy and tasty seafood for consumers all over the world. They have all contributed to the strong results", [sic] says CEO Alf-Helge Aarskog.[97]

98.     Mowi's 2017 annual report also confirmed that since the increases in salmon pricing starting in 2015, its operating profits or "Operational EBIT" (reported in Euros) has

---

[96] *See Salmon Indus. Handbook 2018*, Mᴏᴡɪ, 32 [hereinafter *Mowi Salmon Industry Handbook 2018*].

[97] *See Strong Results for Mowi in the Fourth Quarter 2018*, Mᴏᴡɪ (Feb. 13, 2019).

substantially increased—from 83 million Euros in 2015, to 184 million Euros in 2016, and 214 million Euros in 2017.[98] As noted above, in accounting and finance, earnings before interest and taxes ("EBIT") is a measure of a firm's profit that includes all incomes and expenses (operating and non-operating) except interest expenses and income tax expenses.

99.    Grieg similarly reported that its EBIT per kg gutted weight of fish (in Norwegian Kroners) has increased during the course of the conspiracy. According to Grieg's 2017 annual report, its EBIT was 0.7 Kroners/kg in 2015, 18.0 Kroners/kg in 2016, and 14.4 Kroners/kg in 2017.[99] Grieg's Q4 2018 Quarterly Report announced an EBIT per kg (in Norwegian Kroner) of 14.72 for 2018.

100.    Lerøy has also experienced substantial increases in EBIT/kg (also measured in Norwegian Kroner), increasing from 8.8 Kroners in 2015 to 18.9 Kroners in 2016, and 23.6 Kroners in 2017.[100] In 2018, Lerøy's EBIT/kg was 19.6.[101]

---

[98] *See Integrated Annual Report 2017*, MARINE HARVEST, 7 (2017).

[99] *See* GRIEG SEAFOOD ANNUAL REPORT 2017, *supra* note 39, at 8.

[100]    *See Annual Report 2017 Key Figures*, LEROY SEAFOOD (2017), https://www.leroyseafood.com/en/investor/reports-and-webcast/annual-report-2017/to-the-table/#anchor-article-key-figures.

[101]    *See Preliminary Financial Figures 2018*, LEROY SEAFOOD, 10 (2018), https://www.leroyseafood.com/globalassets/02-documents/english/reports/quarterly-reports/q4-2018-report.pdf.

101.    Similarly, SalMar's EBIT has increased substantially. In 2015, its EBIT was 1404 million Norwegian Kroners. In 2016, its EBIT was 2432 million Kroners. In 2017, EBIT was 3162 million Kroners.[102] In 2018, its EBIT was 3460.8 million Kroners.[103]

102.    Similarly, the stock prices of Mowi ASA, Grieg ASA, SalMar ASA, and Lerøy ASA have all risen dramatically since January of 2013.

103.    These price increases—and the Defendants' coordinated behavior that caused them—have come at the expense of Plaintiff and the Class, who have paid more for farm-raised salmon than they otherwise would have in the absence of Defendants' collusion.

**C.    In Recent Years, Defendants Have Switches From Competition To Cooperation.**

104.    After the dissolution of the FOS in 1991, the Norwegian farmed salmon industry appears to have operated competitively for a while. In recent years, however, the farmed salmon industry has undergone a major shift in attitude, with the key players in Norway and their foreign subsidiaries transitioning from a culture of competition back to a culture of cooperation that once again involves a cessation of trade competition.

105.    **Trade Associations And Industry Organizations.** This attitude is reflected not only in Defendants' unprecedented pricing moves in 2015, but also in their transition to openly collusive behavior reflected in the activities of certain trade associations or industry groups to which some of them belong. These trade associations or industry groups include several entities discussed below.

---

[102] *See* SALMAR ANNUAL REPORT 2017, *supra* note 51, at 4.

[103] *See Quarterly Report – Fourth Quarter 2018,* SALMAR ASA (2018), http://hugin.info/138695/R/2234948/879657.pdf.

106.   One is the Norwegian Seafood Council ("NSC"), which is based in Tromsø, Norway and has offices in 12 countries (including an office in Boston) and which bills itself as "the industry's main source for market insight based on statistics, trade information, consumption and consumer insight."[104] It licenses the "Seafood From Norway" trademark utilized by Norwegian seafood producer-exporters.[105] The NSC conducts a co-funded "Joint Marketing Program" that utilizes this trademark.[106] The NSC utilizes "advisory groups" that meet periodically and give it input and opinions regarding its work; among the members of such groups are Frode Mikkelsen and Knut Hallvard Lerøy of Lerøy, Witzøe of SalMar, Arne Aarhus of OQ, and Erik Holvik of Mowi ASA.[107] As explained in detail below, the data analytics firm SAS Data Management ("SAS") has created a database and analytical tools for the NSC that allow industry members to share current individualized competitor data, including price data. This is undoubtedly one of the things to which the EC was referring when it said the raided firms were suspected of "exchanging commercially sensitive information."

107.   Another Norwegian industry group of note is the *Sjømatbedrifters Landsforening* (the Norwegian Seafood Federation ("NSF")). The Norwegian Defendants are represented in this

---

[104] *About Us*, NORWEGIAN SEAFOOD COUNCIL (Nov. 18, 2016, 2:36 PM), https://en.seafood.no/about-norwegian-seafood-council/about-us/.

[105] *See Licensing "Seafood from Norway"-trademark*, NORWEGIAN SEAFOOD COUNCIL (Feb. 28, 2019, 3:02 PM), https://en.seafood.no/marketing/merke--og-stotteordninger/trademarks-and-labeling/the-country-of-origin-mark/licensing-SFN/.

[106] *See The NSC's Joint Marketing Program*, NORWEGIAN SEAFOOD COUNCIL (Feb. 25, 2019, 9:10 AM), https://en.seafood.no/marketing/merke--og-stotteordninger/bedriftsinitiativ-og-stotteordninger/company-initiative--increasing-the-value-of-norwegian-seafood-together/.

[107] *See Advisory Groups*, NORWEGIAN SEAFOOD COUNCIL, https://en.seafood.no/about-norwegian-seafood-council/advisory-groups/ (last visited Sept. 27, 2019).

organization. Its former Chairman was Ole-Eirik Lerøy, the Chairman of the Board of Mowi since 2010, who was the CEO of Lerøy from 1991 to 2008; Ole-Eirik Lerøy was also not the only executive from Lerøy to move to Mowi. The current CEO of Mowi is Alf-Helge Aarskog ("Aarskog"), who previously served as Executive Vice-President and then CEO of Lerøy, and Mowi's Chief Financial Officer ("CFO") is Ivan Vindheim ("Vindheim") who formerly served in that role at Lerøy.[108] The Deputy Managing Director of the NSF is Trond Davidsen ("Davidsen"), whose views on cooperation among salmon producers are set forth below.

108.    A third industry organization of note is the BC Salmon Farmers Association ("BCSFA"), which is headquartered in Campbell River, British Columbia. Its website states that it "is a forum for communication and cooperation within the salmon farming sector" and "is dedicated to driving communication and cooperation within the salmon farming sector."[109] Its members include OQ NA and subsidiaries of Mowi and Grieg.[110] Its executives include Boschman of Grieg and Dr. Diane Morrison of Mowi Canada.[111]

109.    A fourth important organization is the International Salmon Farmers Association ("ISFA"), which includes the NSF and the BCSFA among its members. Its President is Davidsen

---

[108] *Mowi ASA (MNHVF.PQ) People*, REUTERS, https://www.reuters.com/finance/stocks/company-officers/MNHVF.PQ (last visited Sept. 27, 2019).

[109] *Our Members*, BC SALMON FARMERS ASSOC., http://bcsalmonfarmers.ca/our-members/ (last visited Sept. 27, 2019) [hereinafter *Our Members*]; *About the BC Salmon Farmers Association*, BC SALMON FARMERS ASSOC., http://bcsalmonfarmers.ca/about/ (last visited Sept. 27, 2019).

[110] OUR MEMBERS, *supra* note 109.

[111] *Our Board and Team*, BC SALMON FARMERS ASSOC., http://bcsalmonfarmers.ca/about/board-team/ (last visited Sept. 27, 2019).

of the NSF, who was re-elected as President at a general meeting of ISFA held in Boston in early 2016 and has represented Norway in ISFA since 2012.[112]

110. **Switch To Cooperation Rather Than Competition.** In a speech given in November of 2016, Davidsen explained how the farmed salmon industry in recent years has shifted from competition to cooperation:

> I was part of the trade disputes since mid 1990's and I can still remember how the parties in the processes were able to also take care of the personal relations across the borders. We had days over in Europe where the Scots, the Irish and the Norwegians had been in tough meetings with the European Commission in daytime, before we all went out for dinner in the evening and having an enjoyable time together. **Some were actually really good friends, spending their holidays together. And these good relations made it much easier to shift focus and work together when the trade wars ended**.
>
> \*\*\*
>
> **We have without doubt moved from battling each other in trade wars to cooperating** and finding solutions on common challenges to feeding a growing world population – such as sea lice, feed resources, technology and knowledge in general.
>
> Of course, a general good market situation has removed some of the stress in the salmon industry. **But it seems also to be a fact that a continuously increasing cross border activity in the industry has moved the whole industry into a new way of thinking**. We had cross border activities in the past as well, with Norwegian salmon companies involved in operations in Scotland, Ireland and the US.
>
> **However, the way the salmon business has developed in the last years – with a vast increase in cross border ownership and operations – will probably decrease the risk of any battles between the producing countries in the future.** I am convinced that the increased business integration strengthens the whole industry, improves our operations and makes us even more suited to produce healthy and valuable products to a growing population.

---

[112] *Trond Re-Elected*, INT'L SALMON FARMERS ASSOC. (Mar. 4, 2016), http://www.salmonfarming.org/trond-re-elected/.

***

> I know for sure that all parties involved in the salmon business agree that the potential for further growth is tremendous – and that we need to develop our industry to meet the global demand **rather than fight each other**.[113]

When Davidsen was referring to "trade wars" or "battles" or "fight[ing]" in this speech, he was clearly referring to price competition. As explained below, farmed salmon is a commodity product and the way producers can compete with respect to the sale of it is on the dimension of price.

111.    **Activities Of The GSI.** This commitment to cooperation is also reflected in the activities of the Global Salmon Initiative ("GSI"). As explained on its website:

> In 2012, a small group of CEOs from salmon farming companies from Norway, Chile and Scotland attended a talk about improving environmental reputation. Inspired by stories from other sectors, these CEOs decided to continue the discussions and look at ways they could break down barriers to environmental improvement in the salmon aquaculture sector.
>
> Those leaders quickly realized that when one company performs poorly, it harms the reputation of all, and **instead of using environmental performance as a means of competition, they would secure greater advantages and economic success by working together to lift the performance of the sector as a whole.**
>
> The GSI was launched in August 2013. Now with 16 members, with operations covering 8 countries – Australia, Canada, Chile, Faroe Islands, Ireland, New Zealand, Norway, and the United Kingdom the group represents approximately 50% of the global farmed salmon sector.[114]

---

[113] *Producing Healthy Sustainable Food for the World,* INTERNATIONAL SALMON FARMERS ASSOCIATION, http://www.salmonfarming.org/producing-healthy-sustainable-food-for-the-world/ (emphasis added).

[114] *What is the GSI?*, GLOBAL SALMON INITIATIVE, https://globalsalmoninitiative.org/en/what-is-the-gsi/ (last visited Sept. 27, 2019) (emphasis added).

The original members of GSI included Scottish Sea Farms and the Norwegian entities for Mowi, Grieg, Lerøy, and SalMar.[115] Aarskog, the CEO of Mowi, came up with the idea for the GSI and is its Co-Chair.

112.    Defendants have conceded the purpose of the GSI is inconsistent with normal competition for market share by competitors and that the GSI was undertaken with the goal of increasing revenue.[116]

113.    While the activities of the GSI were focused on how to sustainably produce farmed salmon, it was clearly dedicated to preventing competition by individual companies in the environmental sector. One stated reason for this was a conscious common commitment to "[m]anaging our operations in a manner to support economic growth and stability."[117] If the Defendants by mid-2013 were willing to engage explicitly in "precompetitive cooperation" in order to eliminate individual environmental improvements as a competitive tool, it is entirely plausible that they would do likewise with respect to farmed salmon prices two years later, when the ban on Russian sales was disrupting their market and reducing their profits.

114.    **Sharing Of Sensitive Commercial Information Under The Auspices Of The NSC.** This close cooperation among Defendants is further exhibited in the data collection practices

---

[115] Norway Trondheim, *Global Salmon Initiative (GSI) Launched with Commitment to Sustainable Salmon Farming,* GLOBAL SALMON INITIATIVE (Aug. 15, 2013, 00:01 AM), https://globalsalmoninitiative.org/en/news/global-salmon-initiative-gsi-launched-with-commitment-to-sustainable-salmon-farming/.

[116] Avrim Lazar, *5 Lessons from GSI for Game-Changing Success Through Collaboration*, GLOBAL SALMON INITIATIVE, https://globalsalmoninitiative.org/en/blog/sometimes-the-best-way-to-win-a-game-is-to-change-it/ (last visited Sept. 27, 2019) (emphasis added).

[117] *Why is GSI Important?*, GLOBAL SALMON INITIATIVE, https://globalsalmoninitiative.org/en/why-is-the-gsi-important/ (last visited Sept. 27, 2019).

used by SAS on behalf of the NSC. On its website, SAS touts how it has given confidential "sensitive market insight" to the NSC's constituency, including Defendants:

> The Norwegian Seafood Council employs around 17 people to work on analysis and reporting on a daily basis. **The analysis department has recently set up a new database to give businesses access to sensitive market statistics, including an overview of their own market shares and a comparison of their prices with those of competitors.**
>
> **Customers can compare themselves to other exporters in terms of both price and share of the market.**[118]

This is undoubtedly one of the items the EC was referring to when it declared that the raided firms were suspected of "exchanging commercially sensitive information."

115.    This practice of providing horizontal competitors real-time ongoing price and market share data about each other—a practice to which these competitors obviously agreed—is a real cause for concern. As discussed above, it was a key aspect of the price-fixing conspiracy among FOS, SSGA, SSA, and SSB back in 1989-91.

116.    As the Federal Trade Commission ("FTC") has said:

> [F]orming a trade association does not shield joint activities from antitrust scrutiny: **Dealings among competitors that violate the law would still violate the law even if they were done through a trade association. For instance, it is illegal to use a trade association to control or suggest prices of members. It is illegal to use information-sharing programs, or standardized contracts, operating hours, accounting, safety codes, or transportation methods, as a disguised means of fixing prices**.
>
> **One area for concern is exchanging price or other sensitive business data among competitors, whether within a trade or professional association or other industry group. Any data exchange or statistical reporting that includes current prices, or**

---

[118] *The Norwegian Seafood Council Uses SAS to Give Norwegian Fish Exporters a Competitive Advantage*, SAS INSTITUTE INC., https://www.sas.com/no_no/customers/norwegian-seafood-council.html (last visited Sept. 27, 2019) (emphasis added).

> **information that identifies data from individual competitors, can raise antitrust concerns if it encourages more uniform prices than otherwise would exist.**[119]

117.    Likewise, the United States government delegation stated to the Organization for Economic Cooperation & Development's Competition Committee in a 2010 report that "certain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination…or conspiracy' that unreasonably restrains trade."[120] The presentation was principally authored by the United States Department of Justice ("DOJ") and is part of a list of such submissions on its website.[121] The United States government noted that "[i]n addition to serving as evidence of an unlawful agreement, information exchanges likely to affect prices may, under certain circumstances, be illegal in and of themselves."[122]   Even if the information exchange is not itself an unlawful agreement, it can be powerful evidence of an agreement to fix prices because "[t]he antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price

---

[119] *Spotlight on Trade Associations*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade (last visited Sept. 27, 2019) (emphasis added).

[120] *Roundtable on Information Exchanges Between Competitors Under Competition Law, Note by the Delegation of the United States*, DIRECTORATE FOR FINANCIAL & ENTERPRISE AFFAIRS, ORGANIZATION FOR ECONOMIC COOPERATION & DEVELOPMENT COMPETITION COMMITTEE, 2 (Oct. 21, 2010), https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf.

[121] *U.S. Submissions to the Organization for Economic Cooperation and Development (OECD) Competition Committee*, UNITED STATES DEPT. OF JUSTICE, https://www.justice.gov/atr/us-oecd-submissions-competition-policy (last visited Sept. 27, 2019).

[122] DIRECTORATE FOR FINANCIAL & ENTERPRISE AFFAIRS, ORGANIZATION FOR ECONOMIC COOPERATION & DEVELOPMENT COMPETITION COMMITTEE, *supra* note 120, at 3.

may lead to illegal price coordination." [123] The United States delegation noted that actual evidence of competitive harm, such as industry-wide price movements resulting from the exchange are a strong factor in finding illegality. [124] Other identified factors that may be considered include: (a) "[t]he nature and quantity of the information (extensive exchange of information regarding pricing, output, major costs, marketing strategies and new product development is more likely to have anticompetitive implications);" (b) "[h]ow recent the shared data is (sharing of past data is generally deemed less problematic than sharing current data);" (c) "[t]he parties' intent in sharing the information (an anticompetitive intent, such as an intent to stabilize prices, is problematic);" (d) "[t]he industry structure (in concentrated industries, an exchange among few firms could be more likely to harm competition);" and (e) "[t]he frequency of exchanges (the more frequent the exchange, the more problematic it may be)." [125] The frequent detailed information exchanges among competitors through the NSC satisfy these criteria.

118.    The DOJ and the FTC had made a similar point in their 2000 *Antitrust Guidelines for Collaborations Among Competitors* ("DOJ-FTC Guidelines"):

>  [I]n some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. **Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of**

---

[123] *Id*. at 2.

[124] *Id*. at 4.

[125] *Id*.

**information on current operating and future business plans is more likely to raise concerns than the sharing of historical information. Finally, other things being equal, the sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data.**[126]

119.     **Defendants' Activities Through The North Atlantic Seafood Forum.** Defendants have also used events organized in part by third parties to communicate with each other on cooperative pricing arrangements for farmed salmon or products derived therefrom.  One such event is the annual North Atlantic Seafood Forum ("NASF"), which is described as "[t]he world's largest seafood business conference" and has occurred every March for the last 14 years in Bergen, Norway and generally lasts for three days. [127] It is sponsored in part by major players in the farmed salmon industry, such as Grieg, Mowi, and Lerøy.

120.     In recent years, the NASF conference has proceeded with an initial opening address called "The View from the Bridge" given by so-called "Global Seafood Industry Captains." A speaker at the 2015 meeting was Ole-Eirik Lerøy. There are then typically lunch and "networking" sessions followed by what are called "parallel sessions" devoted to particular industry sectors "for the latest update on industry challenges, supply and market outlook, prices, innovation and business, and sustainability issues." One such parallel session at NASF is a half day "industry workshop" devoted to "global salmon supply, markets and prices." One of the presenters on global

---

[126] *Antitrust Guidelines for Collaborations Among Competitors*, FEDERAL TRADE COMMISSION, 15 (2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf [hereinafter *DOJ-FTC Antitrust Guidelines for Collaborations Among Competitors*] (emphasis added).

[127] *See 10th North Atlantic Seafood Forum, Bergen 2015 – Final Programme*, NORTH ATLANTIC SEAFOOD FORUM (2019), http://prod.dfox.com/public/images/0000438021/000/080/0000804137.pdf.   The 2015 NASF session preceded by a few months the sudden price increases that occurred in mid-2015.

salmon demand at the 2015 and 2016 sessions was Ola Bratvoll ("Bratvoll"), COO and Group Sales Director of the Marine Harvest Group.  At each annual session, there are provided "different arenas for meeting the delegates in an unstressed atmosphere . . ." in order to use "networking opportunities."

121.    NASF sessions are heavily attended by representatives of the Defendants.[128] For instance, at the tenth annual NASF conference in March of 2015—immediately prior to the beginning of the Class Period—the delegates for Grieg were: P. Grieg (Chairman of the Board), Wenche Kjølås ("Kjølås") (Board Member), Karin Bing Orland (Board Member), Asbjørn Reinkind ("Reinkind") (Vice-Chairman), Andreas Kvame ("Kvame") Sandtorv ((CFO), and Utheim (COO).

122.    At the same 2015 session, delegates for Lerøy were: Beltestad (CEO), Sjur Malm ("Malm") (CFO), Annichen Edvardsen ("Edvardsen") (Financial Manager), Jonas Langeteig (Project Controller), and Singelstad (Chairman).

123.    At the same 2015 session, delegates for Mowi (at that time Marine Harvest ASA) were Arild Aakre (Marketing Director), Aarskog (CEO), Brattvoll (COO Sales & Marketing), Kim Galtung Døsvig (IRO), Kristine Gramstad (Global Director Communications), Henrik Heiberg (VP of Finance and Treasury), Inger-Elisabeth Holberg (Controller Global Farming), Andreas Mikalsen (Managing Director RMT Europe), Eivind Nævdal-Bolstad (Public Affairs Manager), Øyvind Oaland (Global Director R&D and Technical), Marit Solberg (COO Farming), Olav

---

[128] *See 10th North Atlantic Seafood Forum, Bergen 2015 - Conference Delegates*, North Atlantic Seafood Forum (2019), http://prod.dfox.com/public/images/0000438021/000/081/0000814865.pdf.

Soleide (Group Controller Sales & Marketing), Vindheim (CFO), Charlie Wu (Managing Director Asia), and Ole-Eirik Lerøy (Chairman).

124.     Similarly, at the 2019 NASF session, to cite another example, the delegates for Grieg were: Kristina Furnes (Global Communications Manager), P. Grieg (Chairman), Kjølås (Board Member), Kvame (CEO), Kathleen Mathison (Chief Human Relations Officer), Reinkind (Vice-Chairman), Sandtorv (CFO), and Utheim (COO). Also present was Grant Cummings (Managing Director of Grieg's Scottish operations).[129]

125.     At the same 2019 session, delegates for Lerøy were: Jennelyn Grude (Team Leader), Tone Myklebust (Head of Frozen Foods), Terje Antero Olsen (Team Leader), Bjørn Opheim (Sales Manager), Carmen Thomasson (Sales Manager), Hans Peter Vestre (Team Leader), Webjorn Barstad (COO for Wildcatch and Whitefish), Cristian Askvik (Team Manager Value Added Production ("VAP") USA), Beltestad (CEO), Endre Edvartsdag (Team Manager), Carmel Egenberg (Team Manager VAP), Thomas Finnøy (Project Manager IT), Ole Jan Flatraker, Per Arve Hausvåg (Team Manager), Knut Hallvard Lerøy (Head of Operation), Malm (CFO), Frode Mikkelsen (Head of VAP), Harald Voltersvik Hernæs (Team Manager), Edvardsen (Finance Chief), Kristren Hoass (Public Affairs), Anne Hilde Midttveit (Head of Quality & Sustainability), Ole Risøy (Head of Analysis), Bjarte Sævig (head of IT), Jørn Erik Toppe (Business Analyst), Pål Erik M. Michelsden (Head of Brands & Digital Marketing), Karoline Møgster (Board member), Hage Torvund Nilsen (Head of Finance, Sales & Distribution), and Ivar Wulff (COO of Sales & Distribution).

---

[129] *14th North Atlantic Seafood Forum - Conference Delegates*, NORTH ATLANTIC SEAFOOD FORUM, 9 (2019), https://d1tosi66po7sm3.cloudfront.net/1551709799/list-of-delegates-14th-north-atlantic-seafood-forum-2019.pdf.

126.     At the same 2019 session, delegates for Mowi were: Aarskog (CEO), Kim Galtung Døsvig (IRO), Ole-Eirik Lerøy (Chairman of the Board), Joachim Ulsrud (Treasury Analyst), Vindheim (CFO), and Jørgen Wengaard (Driftstekniker).

127.     At the 2018 NASF conference, the CEOs of the major Defendants here were also present: Kvame of Grieg, Baltestad of Lerøy, Aarskog of Mowi, and Trond Willikson of SalMar.

128.     **Joint Venture Activity.** As noted above, SalMar and Lerøy are joint owners of Scottish Sea Farms. This fact is conducive to collusion, as explained in the DOJ's and FTC's joint guidelines on collaborations among competitors.  Indeed, the DOJ-FTC joint guidelines provide:

> **Marketing collaborations may involve agreements on price, output, or other competitively significant variables, or on the use of competitively significant assets, such as an extensive distribution network, that can result in anticompetitive harm**. Such agreements can create or increase market power or facilitate its exercise by limiting independent decision making; by combining in the collaboration, or in certain participants, control over competitively significant assets or decisions about competitively significant variables that otherwise would be controlled independently; or by combining financial interests in ways that undermine incentives to compete independently. For example, joint promotion might reduce or eliminate comparative advertising, thus harming competition by restricting information to consumers on price and other competitively significant variables.[130]

### D.     The Structure And Characteristic Of The Market For Atlantic Farm-Raised Salmon Support the Existence Of A Conspiracy.

129.     The structure and other characteristics of the market for Atlantic farm-raised salmon make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

---

[130] DOJ-FTC ANTITRUST GUIDELINES FOR COLLABORATIONS AMONG COMPETITORS, *supra* note 126, at 14 (emphasis added).

130.     The DOJ has emphasized that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred.  Indeed, the DOJ has explained that:

> While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.
>
> - Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.
>
> - The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.
>
> - The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.
>
> - Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.
>
> - Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.
>
> - Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.[131]

---

[131] *Price Fixing, Bid Rigging, And Market Allocation Schemes: What They Are And What To Look For*, FEDERAL TRADE COMMISSION, 5, https://www.justice.gov/atr/file/810261/download (last visited Sept. 27, 2019).

131.    All of these factors are present here. As explained below: (a) the Norwegian farmed salmon industry is dominated by a few top producers with a number of smaller players; (b) farmed Atlantic salmon is a standardized product not readily substitutable with other types of salmon; (c) opportunities to conspire abound in numerous trade associations and industry meetings, and otherwise; (d) Mowi, OQ AS, Grieg, and Lerøy are all headquartered in Bergen, Norway; (e) Grieg BC, Mowi Canada, OQ NA, and OQ Premium Brands are located in British Columbia, Canada; and (f) there is mobility among executives of certain Defendants, such as Ole-Eirik Lerøy, Aarskog, and Vindheim.

### 1.    **Industry Concentration Facilitates Collusion**

132.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

133.    Here, there has been significant (and rapid) consolidation of salmon farming operations around the globe in recent years, as Mowi reports:[132]

---

[132] See MOWI SALMON INDUS. HANDBOOK 2019, supra note 85, at 45

## Industry Structure

### 7.2  Number of players in producing countries



The graph shows the number of players producing 80% of the farmed salmon and trout in each major producing country.

Historically, the salmon industry was dominated by several small firms. As illustrated above, it was the case in Norway, and to some extent in Scotland and Chile.

During the last decades the salmon farming industry has been through a period of consolidation in all regions and this is expected to continue.

The vast majority of the 22 remaining salmon farming companies in Norway are "fringe sellers," to use the words of the DOJ.  And the Norwegian Defendants dominate the market.

134.    The foregoing graphic is consistent with the 2016 speech by Davidsen of ISFA quoted previously, in which he referred to a "vast increase in cross border ownership and operations in recent years."

135.    According to Mowi's own figures, Norway's salmon industry is dominated by Defendants Mowi, Lerøy, SalMar, and Grieg:[133]

---

[133] *Id*. at 44.

## Industry Structure

### 7.1 Top 5-10 players of farmed Atlantic salmon

| | Top 10 - Norway | H.Q. | Top 5 - United Kingdom | H.Q. | Top 5 - North America | H.Q. | Top 10 - Chile | H.Q. |
|---|---|---|---|---|---|---|---|---|
| 1 | Mowi | 230,400 | Mowi | 38,400 | Cooke Aquaculture | 60,800 | "New Aquachile" (Agrosuper) | 109,000 |
| 2 | Salmar | 142,500 | The Scottish Salmon Co. | 29,900 | Mowi | 39,300 | Mitsubishi / Cermaq | 66,000 |
| 3 | Leray Seafood | 137,800 | Scottish Seafarms | 27,500 | Mitsubishi / Cermaq | 21,800 | Salmones Multiexport | 64,800 |
| 4 | Mitsubishi / Cermaq | 57,400 | Cooke Aquaculture | 21,600 | Grieg Seafood | 16,600 | Mowi | 53,200 |
| 5 | Grieg Seafood | 46,100 | Grieg Seafood | 11,900 | * | | Blumar | 47,600 |
| 6 | Nova Sea | 37,900 | * | | | | Camanchaca | 43,600 |
| 7 | Nordlaks | 36,100 | | | | | Australis Seafood | 34,500 |
| 8 | Norway Royal Salmon | 36,000 | | | | | Ventisqueros | 30,300 |
| 9 | Sinkaberg-Hansen | 27,500 | | | | | Invermar | 20,000 |
| 10 | Alsaker Fjordbruk | 26,000 | | | | | Marine Farm | 19,800 |
| | Top 10 | 777,700 | Top 5 | 129,300 | Top 5 | 138,500 | Top 10 | 449,000 |
| | Others | 350,400 | Others | 8,900 | Others | 10,200 | Others | 160,700 |
| | Total | 1,128,100 | Total | 138,200 | Total | 148,700 | Total | 609,700 |

All figures in tonnes GWT
* The industry in the UK and North America are best described by top 5 and top 4 producers, respectively.

Mowi Group represents the largest total production, harvesting around one fifth of the salmon produced in Norway, and about one third of the total production in North America and the UK.

2. **Barriers to New Entry Are High.**

136.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for farming salmon has high entrance barriers.

137.    The production process for farmed salmon is costly and lengthy.

138.    Mowi has diagrammed the process for breeding and growing farm-raised salmon as follows:[134]

---

[134] *See Seafood Value Chain*, MOWI.COM, https://www.mowi.com/product/seafood-value-chain (last visited Aug. 16, 2019).

The life cycle of salmon starts in freshwater and involves several stages before the young salmon (smolt) are ready for the sea.



**EGGS**
Fertilised eggs are kept in incubation tanks in fresh water. There are approximately 5,000 eggs per litre. The eggs hatch into tiny fish (alevins), which have a yolk sac that provides nutrition until they are large enough to feed themselves.

**PARR**
Once they weigh about six grams, the fish are moved to larger freshwater tanks or to an open net cage in a lake. The fish now develop into parr and once they weigh about 60–80 grams they're ready to move on to the smolt stage.





**SMOLT**
This stage is when the fish undergo a physiological change that enables them to move from fresh water to seawater and become young adult salmon. The smolts are kept in net pens in the sea until they mature into adult salmon.

**HARVEST**
After just over a year in the sea the fish will have reached market weight (4.5 to 5.5kg) and are then harvested – in a variety of ways depending on the region.

139.    A report commissioned by the EU titled "Developing Innovative Market Orientated Prediction Toolbox to Strengthen the Economic Sustainability and Competitiveness of European Seafood on Local and Global markets" further depicts how salmon is processed:[135]

---

[135] *See European Union Horizon 2020 research and innovation program, Deliverable No. 3.4 - Report on evaluation of industry dynamics opportunities and threats to industry,* EUROPEAN COMMISSION, https://ec.europa.eu/programmes/horizon2020/en/newsroom/546%20547.



140.    Thus, production of farmed salmon is capital intensive, and the development of marketable fish is a lengthy process—both of which operate as a barrier to entry.

141.    Atlantic salmon is viewed as a separate product distinct from other types of salmon. The EC, in approving Mowi's acquisition of Morpol, a salmon processor, noted that there is a separate product market for the farming and processing of farmed Atlantic salmon.[136]

142.    Mowi's 2018 Investor's Handbook notes that there are relatively few locations in the world that provide the right mix of oceanic conditions for salmon farming and a political environment willing to allow the practice. Moreover, even if new entry could occur in the right geographic location, no additional salmon supply could be brought online in the short run:[137]

---

[136]    Case   No.   COMP/M.6850,   *Marine   Harvest/Morpol*,   ¶   68   (Sept.   30,   2013), http://ec.europa.eu/competition/mergers/cases/decisions/m6850_20130930_20212_3315220_EN .pdf.

[137] *See* MOWI SALMON INDUS. HANDBOOK 2019, *supra* note 85, at 27.



### Salmon Supply

4.3  Few coastlines suitable for salmon farming

The main coastal areas adopted for salmon farming are depicted on the above map. The coastlines are within certain latitude bands in the Northern and Southern Hemisphere.

A key condition is a temperature range between zero and 18-20ºC. The optimal temperature range for salmon is between 8 and 14ºC.

Salmon farming also requires a certain current to allow a flow of water through the farm. The current must however be below a certain level to allow the fish to move freely around in the sites. Such conditions are typically found in waters protected by archipelagos and fjords and this rules out many coastlines.

Certain biological parameters are also required to allow efficient production. Biological conditions vary significantly within the areas adopted for salmon farming and are prohibitive in certain other areas.

Political willingness to permit salmon farming and to regulate the industry is also required. Licence systems have been adopted in all areas where salmon farming is carried out.

143.    Mowi explains that "[i]n all salmon producing regions, the relevant authorities have a licensing regime in place. In order to operate a salmon farm, a license is the key prerequisite. The licenses constrain the maximum for each company and the industry as a whole."[138]

---

[138] *See id.* at 76.

144.     Moreover, wild caught salmon cannot reasonably constrain prices for farm-raised salmon. National Public Radio summarized the breeding and cost advantages that farm-raised salmon have over wild caught salmon in an August 29, 2017 article:

### Why Are Atlantic Salmon Raised In The Pacific Northwest?

Atlantic salmon are not native to the Pacific Northwest. For years, they have been bred to become easier to farm — they're more "highly domesticated," according to the Washington Department of Fish and Wildlife. Most commercial fish farms raise Atlantic salmon.

The WDFW says Atlantic salmon is a "favored species" to farm in cold marine waters because the species grows quickly and consistently, is resistant to disease, and is something people like to eat. Farmed Atlantic salmon are more docile than wild fish.

Atlantic salmon also have been bred to more "efficiently turn feed into flesh," says Michael Rust, the science adviser for NOAA's office of aquaculture.

What used to cost several dollars per pound to grow, worldwide, now costs about $1.25, Rust says. That makes for higher profits.

In the U.S., Washington and Maine are the two largest Atlantic salmon producing states, but they're small beans compared to salmon farms in Canada, Norway and Chile.

Atlantic salmon today, Rust says, probably grow twice as fast as when aquaculture first started. [139]

145.     Wild caught salmon is generally up to twice as expensive per pound as farm-raised salmon.

---

[139] *See* Courtney Flatt, *Why Are Atlantic Salmon Being Farmed In The Northwest?* NAT'L PUBLIC RADIO (Aug. 29, 2017, 7:00 AM), https://www.npr.org/sections/thesalt/2017/08/29/546803147/why-are-atlantic-salmon-being-farmed-in-the-northwest.

3.      **Farm-Raised Salmon Is A Commodity Product And Prices Are Correlated Across the Globe.**

146.    Mowi explains that salmon production is a "commodity" business.  A report issued in 2018 by the EU confirms this point: "[t]he output of most salmonid aquaculture, and Atlantic salmon in particular, is highly commoditised [sic] *i.e.*, there is little differentiation between farms and competition is based purely on price. These products, mostly head-on gutted fresh fish, serve as raw material for further processing. In that situation, large enterprises which can reduce costs of production through economies of scale and offer the lowest price, have a competitive advantage."[140] Commodity products are fungible and consumers and other purchasers have a variety of supply options which makes raising prices by any one supplier difficult in the absence of a conspiracy.

147.    Atlantic salmon is also viewed as a commodity product by third parties. NASDAQ maintains a commodity price index for farmed Atlantic salmon.[141] Market analysts have also recognized that farmed salmon is a commodity.[142]

148.    Furthermore, according to Grieg, salmon prices are linked across the globe, and the Defendants and others closely follow these prices: "[t]here are several reference prices for salmon available. In Norway, Fish Pool ASA provides historic price information as well as future salmon derivative prices FCA Oslo. In the US, Urner Barry provides reference prices for North American

---

[140] *See* EUROPEAN COMM'N, *supra* note 74, at 4.

[141] NASDAQ                SALMON                INDEX, https://salmonprice.nasdaqomxtrader.com/public/report;jsessionid=820D4389ED92CEF09633B A4FC20BC06D?0 (last visited Sept. 27, 2019).

[142] *See* Neil Ramsden, *Marine Harvest aims to be 'Coca-Cola' of salmon*, UNDERCURRENT NEWS (Apr. 4, 2019, 5:21 PM), https://www.undercurrentnews.com/2018/11/13/marine-harvest-aims-to-be-coca-cola-of-salmon/.

salmon in Seattle, and Chilean salmon in Miami. ***Market prices are correlated across regions*** . . . .”[143] (emphasis added). Likewise, Mowi says in its 2018 Handbook that “[c]omparing FCA Oslo, FOB Miami and FOB Seattle, there is a clear indication of a global market as prices correlate to a high degree.”[144] (“FCA” is a trade term indicating that a seller is responsible for the delivery of goods to a specific destination; “FOB” is an acronym for “Free on board,” which indicates whether the seller or the buyer is liable for goods that are damaged or destroyed during shipping).

149.    Mowi also recognizes that “price correlation across regional markets is generally strong for Atlantic salmon.”[145] Accordingly, price-fixing of salmon prices in one market will affect prices globally.

150.    In fact, Mowi tracks the correlation of salmon prices globally in the normal course of its business.[146] The company illustrates this graphically in its 2018 Investor’s Handbook:[147]



---

[143] *See* Grieg Seafood Annual Report 2018, *supra* note 29, at 123.

[144] *See* Mowi Salmon Indus. Handbook 2019, *supra* note 85, at 41.

[145] *See id*. at 40.

[146] *Id*.

[147] *Id*.

151.    This point was also recognized in a 2016 report issued by the Fish Pool and DNB Foods & Seafood (which is part of Norway's largest financial services organization) entitled "World market for salmon: pricing and currencies."[148] The report pointed out that Norwegian farmed salmon gate prices are "strongly linked" and that the collusion by Defendants on those Norwegian prices directly affected prices for farmed salmon raised elsewhere pursuant to the "law of one price."[149]

152.    Indeed, the 2016 report also noted that:[150]



------

[148] *See World market for salmon: pricing and currencies,* FISH POOL (2016), http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf. [hereinafter *Fish Pool*]

[149] As explained below, Mowi operates salmon farms in Chile as well as Norway.

[150] *See* FISH POOL, *supra* note 148.

153.    The 2016 report further elaborates on the economic principle of the "law of one price" as it relates to the farm-raised salmon market in the Unites States:[151]



**4.    Norwegian Companies Dominate The Production Of Farm-Raised Salmon And The Defendants Are The Largest Global Producers.**

154.    A January 3, 2018 article in SalmonBusiness.com—an industry publication— illustrates Norway's dominance in the salmon industry in the following graphic, with about 52% of supply:[152]

---

[151] *See id*.

[152] *See* Berge, *supra* note 80.



**5.** **Norwegian Companies Dominate The Production Of Farm-Raised Salmon And The Defendants Are The Largest Global Producers. Farmed Salmon Production Is Highly Inelastic And The Product is Perishable.**

155.    Mowi acknowledges that:

> Due to the long production cycle and the short shelf life of the fresh product (about 3 weeks), the spot price clears on the basis of the overall price/quantity preference of customers. As salmon is perishable and marketed fresh, all production in one period has to be consumed in the same period. In the short term, the production level is difficult and expensive to adjust as the planning/production cycle is three years long. Therefore, the supplied quantity is very inelastic in the short term, while demand also shifts according to the season. This has a large effect on the price volatility in the market.[153]

156.    Accordingly, in the absence of coordinated conduct among producers, Defendants

are price-takers and cannot control the price of their product. They are unable to reduce the supply

---

[153] *See* MOWI SALMON INDUS. HANDBOOK 2018, *supra* note 96.

of salmon in the short term to raise prices unilaterally, and they must sell during a very short window while their product is fit for human consumption. In the long term, Defendants would have limited incentives to restrict supply when prices are high, thus creating an oversupply in the market that would depress prices in the absence of collusion. These market constraints make the market more susceptible to collusion than markets where goods are not perishable and production levels can be rapidly modulated. As Mowi has noted in its 2018 annual report, "[a]lthough the market price of salmon is established through supply and demand for the product, in the short term, salmon producers are expected to be price takers. The long production cycle and a short time window available for harvesting leave salmon farmers with limited flexibility to manage their short-term supply."[154] As claimed price takers, Defendants had every incentive to collude to ensure that the price they took in the market was as high as they could collectively get it.

E.    **The Alleged Conspiracy Adversely Affected Purchasers In The United States, Which Is A Substantial Market For Farm-Raised Salmon.**

157.    The activities of Defendants, including those undertaken overseas, impact purchasers in the United States of farm-raised salmon and products derived therefrom. The United States is the second largest global market for salmon behind only the EU, as Mowi reports in the graphic below:[155]

---

[154] *See* Mowi Annual Report 2018, *supra* note 4, at 248.

[155] *See* Q4 2019 presentation, Mowi (2019), http://hugin.info/209/R/2234685/879436.pdf.

## Global volume by market

| Markets | Estimated volumes Q4 2018 | Q4 2017 | Compared to Q4 2017 Volume | % | Est. volumes Q3 2018 | 12 month comparison LTM | PTM | % |
|---|---|---|---|---|---|---|---|---|
| EU | 274 900 | 268 100 | 6 800 ⬆ | 2.5% | 247 600 | 955 700 | 921 200 | 3.7% |
| Russia | 24 300 | 23 200 | 1 100 ⬆ | 4.7% | 22 000 | 87 200 | 69 800 | 24.9% |
| Other Europe | 22 900 | 24 500 | -1 600 ⬇ | -6.5% | 20 200 | 81 900 | 79 500 | 3.0% |
| **Total Europe** | **322 100** | **315 800** | **6 300 ⬆** | **2.0%** | **289 800** | **1 124 800** | **1 070 500** | **5.1%** |
| USA | 107 700 | 103 000 | 4 700 ⬆ | 4.6% | 102 200 | 427 900 | 397 700 | 7.6% |
| Brazil | 24 000 | 21 800 | 2 200 ⬆ | 10.1% | 21 600 | 89 400 | 79 900 | 11.9% |
| Other Americas | 38 600 | 31 000 | 7 600 ⬆ | 24.5% | 29 500 | 122 700 | 108 300 | 13.3% |
| **Total Americas** | **170 300** | **155 800** | **14 500 ⬆** | **9.3%** | **153 300** | **640 000** | **585 900** | **9.2%** |
| China / Hong Kong | 25 800 | 27 300 | -1 500 ⬇ | -5.5% | 24 700 | 101 700 | 86 000 | 18.3% |
| Japan | 16 300 | 15 900 | 400 ⬇ | 2.5% | 12 800 | 53 900 | 57 700 | -6.6% |
| South Korea / Taiwan | 15 600 | 12 100 | 3 500 ⬆ | 28.9% | 12 700 | 56 000 | 45 500 | 23.1% |
| Other Asia | 22 200 | 21 400 | 800 ⬆ | 3.7% | 15 100 | 73 100 | 83 500 | -12.5% |
| **Total Asia** | **79 900** | **76 700** | **3 200 ⬆** | **4.2%** | **65 300** | **284 700** | **272 700** | **4.4%** |
| All other markets | 32 900 | 30 400 | 2 500 ⬆ | 8.2% | 29 400 | 116 000 | 108 800 | 6.6% |
| **Total** | **605 200** | **578 700** | **26 500 ⬆** | **4.6%** | **537 800** | **2 165 500** | **2 037 900** | **6.3%** |
| | | | | | | | | |
| Inflow to US from Europe | 25 700 | 25 100 | 600 ⬆ | 2.4% | 22 000 | 93 800 | 95 300 | -1.6% |
| Inflow to EU from Chile | 8 400 | 12 200 | -3 800 ⬇ | -31.1% | 7 600 | 37 700 | 38 300 | -1.6% |

Source: Kontali

- Strong demand globally

- Europe: Increased consumption at higher prices

- US: Convenient and consumer friendly pre-packed products drive growth

- Asia: Increased consumption. Lack of available large sized fish and certain trade restrictions temporarily impacted consumption in China/Hong Kong

Page 26   Source: Kontali
Note: Atlantic Salmon (GWT), LTM: Last Twelve Months, PTM: Previous Twelve Months"

MOWI

158.   A December 12, 2018 article from *Intrafish* further explains:

Salmon import volumes into the United States through October rose 10.5 percent, reaching 272,676 metric tons, according to new figures released by the National Marine Fisheries Service (NMFS).

The value of Atlantic salmon imports rose as well, by 9.5 percent, to reach $2.9 billion (€2.6 billion), up from $2.6 billion (€2.3 billion) during the same period last year.[156]

---

[156]   *See US imports of fresh salmon fillets spike*, INTRAFISH, https://www.intrafish.com/marketplace/1654239/us-imports-of-fresh-salmon-fillets-spike (last visited Sept. 27, 2019).

## **CLASS ACTION ALLEGATIONS**

159.    Plaintiff brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All commercial and institutional purchasers in the United States and its territories that purchased farm-raised salmon and/or products derived therefrom, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of farm-raised salmon or products derived therefrom, from July 1, 2015 to the present. Excluded from the Nationwide Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

160.    Plaintiff also brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States")[157] on behalf of the following class (the "Damages Class"):

> All commercial and institutional purchasers in the Indirect Purchaser States that purchased farm-raised salmon and/or products derived therefrom once or more other than directly from Defendants, entities owned or controlled by Defendants, or other producers of farm-raised salmon or products derived therefrom from July 1, 2015 to the present. Excluded from the Damages Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

161.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

---

[157] The Indirect Purchaser States, for purposes of this complaint, are the states and territory for which there are claims listed in the Causes of Action section below.

162.   Plaintiff reserves the right to modify the class definitions at a later date, including to add the first level of indirect purchasers.

163.   While Plaintiff does not know the exact number of the members of the Classes, there are likely thousands of class members.

164.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of farm-raised salmon and products derived therefrom in the United States;

(b)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of farm-raised salmon and products derived therefrom sold in the United States;

(c)    Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

(d)    The identity of the participants of the alleged conspiracy;

(e)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(f)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(g)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(h)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(i)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

(j)    The effect of the alleged conspiracy on the prices of farm-raised salmon and products derived therefrom sold in the United States during the Class Period;

(k)    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for farm-raised salmon and products derived therefrom, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiff and the other members of the Classes;

(l)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

69

(m)     The appropriate class-wide measure of damages for the Damages Class.

165.    Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for farm-raised salmon and products derived therefrom purchased indirectly from Defendants and/or their co-conspirators. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

166.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

167.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

168.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiff reserves the discretion to certify the Damages Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that

approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

169.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

170.    Hundreds of millions of dollars of transactions in farm-raised salmon and products derived therefrom are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

171.    Defendants' manipulation of the market had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

172.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for farm-raised salmon and products derived therefrom.

173.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of Farm-Raised Salmon, the prices of Farm-Raised Salmon would have been determined by a competitive, efficient market.

## PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

174.    Defendants' antitrust conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to the pricing of farm-raised salmon and products derived therefrom;

(b)     The prices of farm-raised salmon and products derived therefrom have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Purchasers of farm-raised salmon and products derived therefrom have been deprived of the benefits of free and open competition; and

(d)     Purchasers of farm-raised salmon and products derived therefrom paid artificially inflated prices.

175.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of farm-raised salmon and products derived therefrom.

176.    The precise amount of the overcharge impacting the prices of farm-raised salmon and products derived therefrom paid by Plaintiff and the Damages Class can be measured and quantified using well-accepted models.

177.    By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for farm-raised salmon and products derived therefrom than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CAUSES OF ACTION

## COUNT I

## Violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)

178.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

179.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

180.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids, and raise, and/or maintain and fix prices for Farm-Raised Salmon, thereby creating anticompetitive effects.

181.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Farm-Raised Salmon.

182.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated class members in the Nationwide Class that purchased Farm-Raised Salmon have been harmed by being forced to pay inflated, supracompetitive prices for Farm-Raised Salmon.

183.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

184.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Farm-Raised Salmon has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Farm-Raised Salmon provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiff and members of the Nationwide Class who purchased Farm-Raised Salmon indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

185.     Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Farm-Raised Salmon purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

186.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

187.     Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## COUNT II

### Violation of State Antitrust Statutes (on behalf of Plaintiff and the Damages Class)

188.     Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

189.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Farm-Raised Salmon in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

190.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for Farm-Raised Salmon, including in the United States and its territories.

191.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of Farm-Raised Salmon purchased by Plaintiff and members of the Damages Class; and (b)  participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

192.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of Farm-Raised Salmon. As a direct and proximate result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for Farm-Raised Salmon than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

193.   In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and the members of the Damages Class.

194.   Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

195.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

196.    **Arizona:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401, *et seq*.  Defendants' conspiracies had the following effects: (1) price competition for Farm-Raised Salmon was restrained, suppressed, and eliminated throughout Arizona; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401, *et seq*.

197.    **California:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700, *et seq*.  During the Class Period, Defendants and their coconspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720.  Each defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of Farm-Raised Salmon at supracompetitive levels.  The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Farm-Raised Salmon.  For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of Farm-Raised Salmon.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for Farm-Raised Salmon has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Farm-Raised Salmon provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high,

noncompetitive levels in the State of California and throughout the United States; and (3) those who purchased Farm-Raised Salmon indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.  As a result of Defendants' violation of Cal. Bus. & Prof. Code §16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

198.    **District of Columbia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and purchased Farm-Raised Salmon in the District of Columbia, paid supracompetitive, artificially inflated prices for Farm-Raised Salmon, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code §28-4501, *et seq*.

199.    **Iowa:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Farm-Raised Salmon prices were raised, fixed, maintained and

stabilized at artificially high levels throughout Iowa.  During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §553.1, *et seq*.

200.   **Kansas:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §50-101, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas.  During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. §50-101, *et seq*.

201.   **Maine:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Maine; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine.  During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

202.   **Michigan:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771, *et seq*.   Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Farm-Raised Salmon prices were raised,

78

fixed, maintained, and stabilized at artificially high levels throughout Michigan.  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws §445.771, *et seq*.

203.   **Minnesota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. §325D.49, *et seq*.

204.   **Mississippi:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code §75-21-1, *et seq*.

205.   **Nebraska:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska.  During the Class Period,

Defendants' illegal conduct substantially affected Nebraska commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. §59-801, *et seq.*

206.    **Nevada:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010, *et seq*.

207.    **New Hampshire:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire.  During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §356:1, *et seq*.

208.    **New Mexico:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico

commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

209.    **New York:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New York; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq*.

210.    **North Carolina:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

211.    **North Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Farm-Raised Salmon prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout North Dakota.  During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code §51-08.1-01, *et seq*.

212.    **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed and eliminated throughout Oregon; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq*.

213.    **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq.* The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island.  During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq.*

214.    **South Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was

restrained, suppressed, and eliminated throughout South Dakota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.*

215.   **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee.  During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. §47-25-101, *et seq*.

216.   **Utah:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Utah; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

217.   **Vermont:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and

eliminated throughout Vermont; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 V.S.A. § 2465, *et seq.*

218.    **West Virginia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

219.    **Wisconsin:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §133.01, *et seq*.

## COUNT III

### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff and the Damages Class)

220.    Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

221.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

222.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at noncompetitive and artificially inflated levels, the prices at which Farm-Raised Salmon was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.  The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

223.    **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code

§17200, *et seq*.  During the Class Period, Defendants manufactured, marketed, sold, or distributed Farm-Raised Salmon in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200, *et seq*., by engaging in the acts and practices specified above.  This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200.  The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720, *et seq*., set forth above.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720, *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Farm-Raised Salmon in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200, *et seq*.  Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.  The unlawful and unfair business practices of Defendants, and each of them, as

described above, have caused and continue to cause Plaintiff and the members of the Damages Class to pay supracompetitive and artificially inflated prices for Farm-Raised Salmon. Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200, *et seq*. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

224.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Florida; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, plaintiff and members of the Damages Class seek all relief available under Fla. Stat. §501.201, *et seq*.

225.    **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff as a purchaser of the Defendants' goods, and which caused Plaintiff to suffer injury. Defendants

took efforts to conceal their agreements from Plaintiff and the members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and Farm-Raised Salmon purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute and as equity demands.

226.    **Missouri:** Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Defendants engaged in the conduct described in this Class Action Complaint in connection with the sale of products containing Farm-Raised Salmon in Missouri. During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and consumers. Defendants agreed to, and in fact did, fix, control, and maintain at artificial and non-competitive levels, the price at which Farm-Raised Salmon was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiff and the members of the Damages Class. Defendants concealed, suppressed, and failed to disclose material facts to Plaintiff and the members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. The concealed, suppressed, and omitted facts would have been important to Plaintiff and the members of the Damages Class as they related to the cost of products containing

Farm-Raised Salmon. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for products containing Farm-Raised Salmon. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and the members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and the members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this Count.

227.  **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed Farm-Raised Salmon in Nebraska, and Defendants' illegal conduct substantially

affected Nebraska commerce and Farm-Raised Salmon purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

228.    **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold Farm-Raised Salmon in New Hampshire and deceived Plaintiff and Class Members in New Hampshire into believing that the Farm-Raised Salmon were competitively priced. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased the Farm-Raised Salmon in New Hampshire were deprived of free and open competition in New Hampshire; and (4) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased Farm-Raised Salmon in New Hampshire paid supracompetitive, artificially inflated prices for Farm-Raised Salmon in New Hampshire. During the Class Period, Defendants marketed, sold, or distributed Farm-Raised Salmon in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and Farm-Raised Salmon purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

229.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiff and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing Farm-Raised Salmon because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Farm-Raised Salmon, including their illegal conspiracy to secretly fix the price of Farm-Raised Salmon at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed and eliminated throughout New Mexico; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Farm-Raised Salmon.  During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further

injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

230.  **New York:**   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their coconspirators made public statements about the prices of Farm-Raised Salmon that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Farm-Raised Salmon; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased Farm-Raised Salmon were misled to believe that they were paying a fair price for Farm-Raised Salmon or the price increases for Farm-Raised Salmon were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing Farm-Raised Salmon would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing Farm-Raised Salmon would have a broad impact, causing commercial and institutional indirect purchaser class members who indirectly purchased Farm-Raised Salmon to be injured by paying more for Farm-Raised Salmon than they would have paid in the absence of Defendants' unlawful

trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of customers and commercial and institutional indirect purchasers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout New York; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Farm-Raised Salmon. During the Class Period, Defendants marketed, sold, or distributed Farm-Raised Salmon in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Farm-Raised Salmon in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

231. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their

illegal acts.   Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.   Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware.   Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed and eliminated throughout North Carolina; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Farm-Raised Salmon.   During the Class Period, Defendants marketed, sold, or distributed Farm-Raised Salmon in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.   During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Farm-Raised Salmon in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

232.   **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. Defendants misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Farm-Raised Salmon was restrained, suppressed, and eliminated throughout North Dakota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and Farm-Raised Salmon purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Farm-Raised Salmon, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et*

*seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

233.    **Rhode Island:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws § 6-13.1-1, *et seq.*) Members of the Damages Class purchased Farm-Raised Salmon for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Farm-Raised Salmon. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers, including commercial and institutional indirect purchasers that serve as a conduit to consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and

members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Farm-Raised Salmon, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Farm-Raised Salmon they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

234.    **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) Farm-Raised Salmon price competition was restrained, suppressed and eliminated throughout South Carolina; (2) Farm-Raised Salmon prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq.*, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

235.     **South Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon was sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. Defendants misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Farm-Raised Salmon was restrained, suppressed, and eliminated throughout South Dakota; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and on those who purchased Farm-Raised Salmon in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Farm-Raised Salmon, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Farm-Raised Salmon

they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

236.   **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Farm-Raised Salmon. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Farm-Raised Salmon, likely misled all commercial and institutional indirect purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and,

accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

237.   **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Farm-Raised Salmon was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' Farm-Raised Salmon prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Farm-Raised Salmon was restrained, suppressed, and eliminated throughout Wisconsin; (2) Farm-Raised Salmon prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of Farm-Raised Salmon. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of Farm-Raised Salmon at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Farm-Raised Salmon at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Farm-Raised Salmon they purchased. Defendants have engaged in unfair competition

or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

## COUNT IV

### Unjust Enrichment[158]
### (on behalf of Plaintiff and the Damages Class)

238.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

239.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

240.    Defendants have unlawfully benefited from their sales of Farm-Raised Salmon because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held commercial and institutional indirect purchasers, which purchased Farm-Raised Salmon at prices that were more than they would have been but for Defendants' unlawful actions.

241.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and members of the Damages Class.

242.    Plaintiff and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Damages Class.

243.    Defendants have been enriched by revenue resulting from unlawful overcharges for Farm-Raised Salmon while Plaintiff and members of the Damages Class has been impoverished

---

[158] Unjust enrichment claims are alleged herein under the laws of the states for which claims are alleged in Counts Two and Three above.

by the overcharges they paid for Farm-Raised Salmon imposed through Defendants' unlawful conduct.  Defendants' enrichment and the impoverishment of Plaintiff and members of the Damages Class are connected.

244.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

245.    Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

246.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Farm-Raised Salmon.

247.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Farm-Raised Salmon are ascertainable by review of sales records.

248.    It would be futile for Plaintiff and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Damages Class with respect to Defendants' sales of Farm-Raised Salmon.

249.    It would be futile for Plaintiff and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly

purchased Farm-Raised Salmon, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiff and the Damages Class for Defendants' unlawful conduct.

250.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Farm-Raised Salmon is a direct and proximate result of Defendants' unlawful practices.

251.     The financial benefits derived by Defendants rightfully belong to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

252.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for Farm-Raised Salmon derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

253.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as Farm-Raised Salmon prices remain inflated above pre-conspiracy levels.

254.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Damages Class all unlawful or inequitable proceeds they received from their sales of Farm-Raised Salmon.

255.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Farm-Raised Salmon by Plaintiff and the Damages Class. Plaintiff and the Damages Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment for the following relief:

256.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

257.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively (d) acts of unjust enrichment by Defendants as set forth herein.

258.   Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

259.   Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

260.   Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis;

104

261.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

262.     Plaintiff and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

263.     Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

264.     Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: September 30, 2019                    Respectfully submitted,

**BERMAN & SIMMONS**
By:   _/s/ Taylor Asen_
Taylor Asen
129 Lisbon Street
Lewiston, Maine 04240
Telephone:  207-560-0692
Email:  tasen@bermansimmons.com

**COTCHETT, PITRE & McCARTHY, LLP**
Adam J. Zapala (to apply *pro hac vice*)
840 Malcolm Road
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
Email:  azapala@cpmlegal.com

**GUSTAFSON GLUEK PLLC**
Daniel C. Hedlund (to apply *pro hac vice*)
Michelle J. Looby (to apply *pro hac vice*)
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone:  (612) 333-8844
Facsimile:  (612) 339-6622
Email:   dhedlund@gustafsongluek.com
Email:  mlooby@gustafsongluek.com

**BARRETT LAW GROUP, P.A.**
Don Barrett (to apply *pro hac vice*)
Katherine Barrett Riley (to apply *pro hac vice*)
David McMullan (to apply *pro hac vice*)
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
Email:  dbarrett@barrettlawgroup.com
Email:  kbriley@barrettlawgroup.com
Email:  dmcmullan@barrettlawgroup.com

**LARSON • KING, LLP**
Shawn M. Raiter (to apply *pro hac vice*)
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6518
Email:  sraiter@larsonking.com

**DUBBIN & KRAVETZ, LLP**
Samuel J. Dubbin, P.A. (to apply *pro hac vice*)
1200 Anastasia A venue
Coral Gables, Florida 33134
Telephone:  (305) 371-4700
Email:  sdubbin@dubbinkravetz.com

**CUNEO GILBERT & LADUCA, LLP**
Jonathan W. Cuneo
Daniel Cohen
Jennifer Kelly
Blaine Finley
4725 Wisconsin Ave., NW
Suite 200
Washington, DC 20016
Telephone:  (202) 789-3960
Email:  jonc@cuneolaw.com
Email:  danielc@cuneolaw.com
Email:  jkelly@cuneolaw.com
Email:  bfinley@cuneolaw.com

*Counsel for Plaintiff and the Proposed Classes*